(No. 15457.—Reversed and remanded.)
WILLIAM SHARKEY, Conservator, Appellee, *vs.* JENNIE
SISSON *et al.* Appellants.

*Opinion filed October 20, 1923—Rehearing denied Dec. 7, 1923.*

1. EQUITY—*a complainant must recover, if at all, on the case made by his bill.* Allegations and proof must correspond, and relief must be denied on the facts proved by the evidence if there are no averments in the bill to which the evidence applies.

2. SAME—*when decree setting aside deeds cannot be sustained.* A decree setting aside certain deeds at the suit of the grantor's conservator on the ground that a fiduciary relation was shown to have existed between the grantor and one of the grantees, cannot be sustained where there is no averment in the bill that such relation existed, although the bill charges undue influence.

3. DEEDS—*test of mental capacity to make a deed.* The test of mental capacity necessary to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act; and mere impairment of memory due to old age does not, of itself, establish a lack of mental power to make a deed.

4. SAME—*when mental capacity necessary to make a deed is no greater than is required to make a will.* No greater degree of mental capacity is necessary in order to make a deed of voluntary settlement reserving a life estate in the grantor than is required to make a will.

5. SAME—*the weight to be given expert testimony as to mental capacity.* Testimony of physicians concerning the mental capacity of the grantor or testator is entitled to no greater weight than testimony of laymen of good common sense and judgment who have had good opportunity for observation.

6. APPEALS AND ERRORS—*when decree must be reversed.* A decree in a chancery proceeding must be reversed if the Supreme Court, from a consideration of the whole record, is of the opinion the decree is not sustained by the evidence.

APPEAL from the Circuit Court of Edgar county; the Hon. AUGUSTUS A. PARTLOW, Judge, presiding.

STEWART W. KINCAID, GEORGE W. BRISTOW, and CRAIG & CRAIG, for appellants.

O'HAIR & MCCLAIN, for appellee.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

William Sharkey, as conservator of George W. Morris, filed his bills in the circuit court of Edgar county to set aside two deeds made by Morris on January 2, 1922, in one of which Jennie Sisson was grantee and in the other Hatch Henson was the grantee. The deeds expressed consideration of one dollar each, and both reserved a life estate to the grantor in the property conveyed. The deed to Jennie Sisson conveyed 140 acres of land, which was the home place of the grantor, and the deed to Henson conveyed to the grantee 96 acres. Both bills alleged that the grantor at the time of executing the deeds was in his dotage and his mind and memory were so impaired as to render him incapable of knowing what he was doing and the effect of his acts or the nature of the business engaged in. Both bills alleged that the grantees and others, by means of undue influence, fraud and falsehood, induced the grantor to execute the deeds. The bills were answered by the respective defendants, denying all the material allegations as to unsoundness of mind and undue influence. The cause was heard before the court. It was stipulated by the parties that the two cases be tried at the same time and heard on the same testimony, but as there might be evidence which would be competent in one case and not competent in the other, it was further stipulated that after the hearing the court should enter a decree in each case upon evidence applicable to the case and render separate decrees, so that if the case were reviewed by the Supreme Court only one certificate of evidence, one record and one set of briefs and abstracts would be required. After hearing the evidence the court set aside the deeds in both cases on the ground of mental incapacity of the grantor to execute them, and also on the ground that there was a fiduciary relation existing between the grantor and Henson. The defendants to both bills appealed from the decree to this court, and the

causes are submitted here as one case, upon one record, one set of briefs and abstract. The parties will be referred to as complainant and defendants.

George W. Morris was seventy-five years old at the time he executed the deeds, January 2, 1922. He owned 350 acres of land in Edgar county, worth about $200 an acre, and about $20,000 worth of personal property. He had been married in 1890 to a sister of defendant Jennie Sisson. No children were born of the marriage and his wife died several years ago. Mrs. Sisson lived with Morris and his wife from 1890 to 1894 and was married to her present husband while living at their house. She had a daughter born of the marriage, and when the child was two or three years old she went to live with Morris and wife, and lived there until Mrs. Morris died, in 1907. Morris was married a second time but was divorced from his second wife, and no children were born of that marriage. He had three sisters: Amanda, now dead, who married Peter Voorhees; Sarah, now living, who is the second wife of Peter Voorhees; and Martha Perisho. Amanda left a number of children surviving her, among them John W. Voorhees and Lizzie Henry, who took an active part in the litigation. Hatch Henson began working for Morris when he was twelve or fourteen years of age and has worked for him ever since. When he was about seventeen years old he prepared to leave Morris to work for another man, and Morris persuaded him not to do it, promising that he was going to take care of him, and Henson continued to work for Morris. Henson appears to have worked the farm as tenant from 1911 to March 1, 1918, when Morris rented the farm for three years to complainant, who lived on the place until March 1, 1921. In the fall of 1921 Morris asked John Voorhees, his nephew, a son of his deceased sister, Amanda, to find him a tenant. Voorhees secured Roy Hillery, and in September, 1921, Morris made a written lease to Hillery, by the terms of which Hillery was to take possession the

spring of 1922. After the lease was made Morris rented part of the farm as pasture to other persons until the term of the Hillery lease began, and Hillery was in possession under the lease at the time of the trial. In March, 1921, Sarah Voorhees, a sister of Morris and aunt and step-mother of John Voorhees, filed a petition to have a conservator appointed for Morris. Summons was served but Morris did not appear, and John Voorhees was appointed conservator. Shortly afterwards Morris consulted attorneys about having the appointment of a conservator set aside, and it was set aside March 26, 1921, as we understand, without any proceeding for that purpose having been filed. The conservator, Voorhees, testified he voluntarily re-instated Morris because he was dissatisfied. Since 1915 Morris has lived with his sister Mrs. Voorhees, in Paris, and with Hatch Henson,—the greater part of the time with Mrs. Voorhees. The deeds sought to be set aside were, as we have stated, executed January 2, 1922. At that time Morris was staying at the home of his sister Mrs. Perisho. In January, 1922, the two sisters of Morris, Mrs. Voorhees and Mrs. Perisho, filed another petition to have a conservator appointed for Morris. A hearing was had on the petition in the spring of 1922 but the jury disagreed. By agreement the cause was certified to the circuit court, but that court decided it had no jurisdiction of the case and certified it back to the county court, where a conservator was appointed December 27, 1922, and that conservator, Sharkey, filed the bills to set aside the deeds.

The issues made by the pleadings were, whether Morris had sufficient mental capacity to make valid deeds at the time the deeds were executed, and whether they were procured by the undue influence of the grantees. No issue of fiduciary relation between the grantor and grantees was made by the pleadings and no relief was asked in the bill on that ground. A complainant must recover on the case made by his bill. He cannot state one case in the bill and

make a different one by the proof. Allegations and proof must correspond. If the case made by the proof is variant from that stated in the bill, relief cannot be granted. Relief will be denied on the facts proved by the evidence where there are no averments in the bill to which the evidence applies. (*McKay* v. *Bissett,* 5 Gilm. 499; *Howard* v. *Burns,* 279 Ill. 256; *Kosturska* v. *Bartkiewicz,* 241 id. 604.) In Pomeroy's Equity Jurisprudence (vol. 2, sec. 955,) the author discusses the distinction between a case where the proof establishes actual undue influence designedly exerted upon a party susceptible to such influences on account of mental weakness, old age and the like, and a case where the evidence establishes the charge of a fiduciary relation existing between parties to a transaction. The author says when undue influence is established as a fact, any contract or other transaction accomplished by its means is voidable and is set aside without the necessary aid of any presumption; that where the charge is of a fiduciary relation between the parties to a transaction, mental weakness, old age and the like are not assumed as an element in the transaction; that such facts may be present but are immaterial and not essential. The author says: "Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject than the treatment of actual undue influence and fiduciary relations as though they constituted one and the same doctrine." That text was quoted with approval in *Thomas* v. *Whitney,* 186 Ill. 225, and *Beach* v. *Wilton,* 244 id. 413.

Without intimating an opinion whether in the case of Hatch Henson the existence of a fiduciary relation was or was not proved between him and Morris, it is not even contended that any such relation existed between Mrs. Sisson and Morris. Counsel for complainant say she was not present when the deed was made to her, and there is no evidence she had any connection with its execution or even knew that it was being made, but they say she benefited by a confidential relation existing between Henson and Morris,

and as both deeds were made at the same time both should be set aside. We merely mention counsel's position, and without further reference to it we are bound to hold that the decree cannot be sustained on the ground that a fiduciary relation existed between Henson and Morris, as no relief was asked in the bill on that ground.

The question remains whether Morris' mind was so impaired that he was mentally incapable of making a valid deed. On that question seventy-two witnesses testified,— thirty-seven for complainant and thirty-five for defendants. Among complainant's witnesses were ten who are relatives of Morris, most of whom would benefit by setting the deeds aside, and five were doctors residing in Paris who were engaged in the general practice of medicine. We shall not undertake to set out the testimony of all the witnesses. The chancellor filed a written opinion, in which he stated he regarded the testimony of the doctors entitled to greater weight than the testimony of the lay witnesses. We will therefore summarize their testimony.

Dr. Musselman testified that he had practiced medicine in Paris and the community for forty-three years and had known Morris for twenty years. Had treated him during that time as his physician. Observed a change in Morris' mental condition four or five years before the trial. He was growing forgetful. This progressed, and later he became unsteady in gait. Impairment of memory progressed. He became more untidy in his person. He had senile dementia, caused by hardening of the arteries. The doctor examined Morris the day before he testified, for the purpose of testifying as a witness. He testified Morris had lost the use of his hands to some extent. His memory was growing worse. He could not tell the doctor his age. His blood pressure was about normal. Witness had seen Morris a good many times in the last five years. Saw him five or six times in 1920 and at different times in 1921 and prescribed medicine for him. Could not say he saw him in

1922. Had not seen him for the last year. The doctor expressed the opinion that Morris was mentally incapable of transacting ordinary business January 2, 1922. He said he was capable of knowing his property and telling how much land and how much money he had in the bank but would not be competent to dispose of it.

Dr. Link testified he had practiced in Paris and vicinity twenty-two years and had known Morris fifteen or twenty years. Had talked to him half a dozen times a year during the last four years. About two years before testifying he talked with him on the street about some bladder symptoms Morris had. The doctor examined Morris at his sister's house five or six days before he testified. He had hardening of the arteries and was afflicted with senile dementia,—the last stage of senile debility. The trouble had been going on at least four or five years and the condition of senile dementia had existed two years at least. The disease gradually grew worse, and in his opinion Morris was of unsound mind in January, 1922, and incapable of transacting ordinary business. He never talked to Morris about business or property. He never saw him January 2, 1922, and would not say Morris did not then know what property he had; but from the doctor's experience in such cases he was of opinion Morris would not be capable in January, 1922, of transacting business. His condition was progressive, and in some cases the progress is faster than in others. He would not say Morris would not know what land he owned January 2, 1922, or who his relatives were, but said he was in no condition to sign deeds.

Dr. Conklin testified he had been practicing medicine in Paris and vicinity for sixteen years and knew Morris when he saw him but had no personal acquaintance with him. In May, 1922, he was in his yard doing something and heard someone make a peculiar remark. He looked up and it was Morris. He did not remember just what was said though he talked to him two or three minutes. He exam-

ined Morris before he testified, with a view of becoming a
witness. Morris was at the house of his sister, Mrs. Voor-
hees, and she was present. Morris could not recollect his
age and did not talk connectedly,—said he could not re-
member. The doctor said he was suffering with senile de-
bility physically and senile dementia mentally. This was
due to hardening of the arteries, and the weakened mental
condition was senile dementia. The doctor said in his opin-
ion he had been suffering from senile debility over a period
of five years and from senile dementia from three to five
years. From the nature of the disease and the length of
time it had progressed, in his opinion Morris' mental con-
dition was unsound January 2, 1922, and he was then in-
competent to transact ordinary business. He would not
say whether on January 2, 1922, Morris knew what prop-
erty he had or not, but said he did not think he would un-
derstand a deed.

Dr. Slaughter testified he had practiced his profession
in Edgar county about fifteen years and had known Mor-
ris ten years. He had seen him pretty often in the last
four or five years,—six, seven or ten times a year. Had
talked with him but could not remember whether he talked
with him during the year 1922. About two years before,
Morris was in his office and mistook him for Dr. Mus-
selman. It was the doctor's opinion Morris did not have
sufficient mental capacity to transact ordinary business.
Before he testified he examined Morris with a view to de-
termining his mental condition and found he had harden-
ing of the arteries, which condition in his opinion had ex-
isted for three or four years, until it had reached the stage
of senile dementia. The doctor expressed the opinion he
could not have been of sound mind in January, 1922, or
for the last three years. He did not have mental capacity
in January, 1922, to comprehend an instrument like a con-
veyance of real estate. He never talked to Morris about
his property or who his relatives were. He would not state

as a positive fact Morris was in January, 1922, incapable of understanding the nature and effect of a deed, but said in his opinion he was.

Dr. Laughlin testified he lived in Paris. He had practiced medicine there for thirty years and had known Morris for twenty years. He examined him on Monday before testifying for the purpose of qualifying as a witness, and said he had hardening of the arteries, and senile dementia as a result. It is a progressive disease, which gradually grows worse. He must have been suffering from it five years. He said in his opinion Morris had not sufficient mind in January, 1922, to understand and transact ordinary business affairs. Morris was never a patient of the witness and he never examined him except the Monday before testifying, when he went at the request of counsel for complainant. He said senile dementia never progresses very rapidly. One could not tell by looking a man over to-day the exact state he was in a year ago. He did not know, if Morris made a deed in January, 1922, and it was explained to him what it was, whether he would be capable of understanding it in a reasonable manner.

The other witnesses for complainant testified to their acquaintance with and opportunities for observing Morris and to his acts, conduct and conversations, from which they expressed the opinion his mind was so impaired at the time he made the deeds that he could not understand and comprehend the nature of his act. His eyesight was very bad and he had trouble getting glasses that would help his vision. In conversation he would go from one subject to another and talk in a disconnected way. He became careless about his personal habits and appearance. He would get lost in the home where he was living or in the streets of Paris and get someone to take him home. Sometimes he would try to get in or out of the house through a window. He had difficulty in dressing himself, and latterly he had difficulty in hitching his horse to his buggy when he wanted to drive.

For some time prior to 1921 he relied on John Voorhees, his nephew, to help him in the transaction of his business, and Voorhees did much of the business for him. Morris signed most all of the checks drawn on his bank account, but Voorhees or someone else would fill them out for him to sign. Before 1921 the board of review repeatedly notified him to appear before it, but he paid no attention to the notices. Sometimes he lost his money in the house and it had to be found for him. He sometimes signed checks Voorhees made out, who told him what they were for and told him to sign without inquiring about them. During the last few years Voorhees or someone else attended to the payment of his taxes. He was irritable and sometimes cursed. He would forget the names of people he knew, and was difficult to get along with at his sister's, where he lived. On some occasions he answered the call of nature in the house. These are not all the things testified to by members of his sisters' families and the other witnesses from which they inferred unsoundness of mind, but we believe fairly represent the character of Morris' acts and conduct which led the witnesses to state that in their opinion he was of unsound mind in January, 1922.

Morris lived at the home of his sister Mrs. Perisho, in Paris, from October, 1921, until the deeds were executed. While he stayed there he went back and forth to the farm with Henson. Mrs. Perisho testified he left her house the first or second of January and went to Henson's She testified he knew what property he had at that time, looked after it, took care of the hay and sold it. Mrs. Voorhees, another sister of Morris, at whose house he stayed prior to October, 1921, testified that while staying there he would go to the farm with Henson and to town with Voorhees. Among other things, she testified she did not know what business her brother transacted the last year or two, but that he did know what farm land he owned and who his relatives were. Mrs. Perisho's husband testified Morris

boarded with them from October, 1921, until January, 1922. He left them the morning of January 2 but had frequently been back there. At the time of the trial he was staying with Mrs. Voorhees. After the deeds were made he stayed some time at Henson's and some time at Mrs. Sisson's, who lived near Dana, Indiana. The morning Morris left witness' house he got up about five o'clock to go down-town. He did not wait for breakfast. Witness went to the street with him and directed him which way to go. Morris did not return to the house for a few days and then he returned for his clothes. Mrs. Perisho testified she bundled the clothes up and he took them out to a buggy in front of the house. Henson was in the buggy and they drove away together. The next place Morris was seen after leaving Perisho's house, so far as is disclosed by the testimony, was at the office of the lawyer who drew the deeds, at about ten o'clock in the forenoon.

Some of the witnesses who testified for defendants lived in Indiana, where Mrs. Sisson lived with her husband on a farm. They saw Morris at her house in 1921 and 1922 and after the execution of the deeds. The testimony shows that in 1921 and 1922 Morris was frequently at the Sisson house, and the Indiana witnesses were neighbors of the Sissons and met him while visiting there. All testify to seeing him frequently and talking with him about business and other subjects. They related conversations they had with him, and testified that in their opinion he was of sound mind. Other witnesses for defendants who were acquaintances of Morris in Illinois and saw him at different times during the years 1921 and 1922, testified that in their opinion he was of sound mind, and stated the opportunities they had and the conversations with him from which they formed that opinion.

Blanche Davidson was stenographer in the office of the lawyer who prepared the deeds. She testified Morris came to the office alone about ten o'clock in the morning of Janu-

ary 2, 1922, and stayed till a little past twelve. He said he wanted to dispose of his property; that he wanted to make a will and two deeds. He said he wanted to give Henson 96 acres of land because Hatch had always been with him and he wanted Hatch to have something after he was gone. He wanted Mrs. Sisson to have the home place of 140 acres. He said she was his first wife's sister; that his wife had helped him make a part of what he had and died before enjoying it, and he thought it right some of her people should have some of the property. He also stated he wanted to make a bequest of money to some other people he mentioned, and stated why. The remainder of his property he wanted disposed of according to the Statute of Descent. After twelve o'clock he telephoned Henson to come to the office for him. Kincaid, the lawyer, told him to return to the office about four o'clock. During the time Morris was in the office in the forenoon he told Kincaid what he wanted done. Kincaid dictated the will to the stenographer, and after each paragraph would ask Morris if that was what he wanted, and he would say it was. Morris returned to the office about three o'clock. The deeds were made about 5:30 o'clock, but as Morris suggested some changes in the will it had to be copied, and that was completed about six o'clock. Morris wanted H. O. Boyer and W. A. Summers to witness his will. They were called to the office and witnessed the will. No one was there except the witness, Kincaid, Boyer and Summers. Henson came after Morris about 6:30. Morris was about an hour telling what he wanted done. He talked slowly, but never halted or lacked for words or ability to speak.

H. O. Boyer witnessed the will. He testified he had known Morris thirty years. He met him in Kincaid's office about seven o'clock in the evening of January 2, 1922. Morris said he wanted to make a deed to Mrs. Sisson for 140 acres of land and one to Henson for 95 or 96 acres. They went into the rear room of Kincaid's office. Morris

said his wife helped him to accumulate his property and he had always felt some of her people should have some of it, and that was why he wanted to make the deed to Mrs. Sisson. He said Henson came to live with him when twelve or fourteen years old and had been with him most of the time since. He had been a good boy, and Morris said he owed it to Henson to give him a piece of land. As to the will, the witness testified the stenographer or Kincaid,—he was not certain which,—would read it and Morris would say whether it was as he wanted it. In one or two instances it was not as he wanted. it, and it was changed and re-written by the stenographer. Both deeds and the will were read to Morris before he signed them. Henson brought Morris up the stairway to Kincaid's office but did not remain there and was not present when the deeds and will were executed. He took Morris away after the papers were signed. The witness stated his opinion was that Morris was of sound mind at the time and knew what he was doing; that from his acquaintance with Morris and talk with him during the last four years he believed him of sound mind. Summers, the other witness to the will, is dead.

Mrs. Staats, who lived on a farm adjoining the Sisson farm in Indiana, in addition to testifying she believed Morris was of sound mind in 1921 and 1922, testified she often saw him when he would be visiting at the Sissons and had many conversations with him. He was much attached to Mrs. Sisson, and had been very fond of her little daughter who was dead and who had lived with Morris and his wife a few years. He would go to the witness' house to telephone to Paris about his business. He had intended placing a monument at the child's grave, but later told the witness he was going to give Mrs. Sisson some property and let her erect such monument as she pleased. He said Mrs. Sisson had earned his regard. She had cared for his wife during her illness, had been good to his aged mother, and he was going to give her part of his property. That

was in June, 1921. In 1922 he told the witness he had carried out his intention and had made Mrs. Sisson a deed.

Mrs. Mays testified that in July, 1922, Morris told her he had fixed it so Mrs. Sisson could have the home place; that he wanted her to live there so he could be with her; that she had been like a daughter to him and had taken care of his wife and his mother. The witness thought he was of sound mind then.

Other witnesses testified to statements of Morris that he intended Henson and Mrs. Sisson to have some of his land when he was through with it. Some of these statements were made as far back as sixteen years ago, and in some of them he said he was going to give Henson the 96 acres he deeded him. Some of defendants' witnesses had done business with Morris within a short period of the execution of the deeds. While the proof shows that on account of defective vision, failing physical powers and memory, Morris relied on others to help him in many, perhaps most, of his business transactions during the last few years, the proof also shows he looked after his farm, rented it, made sales of hay, and worked about his farm much of his time. His sisters testified he knew what property he had; that he went to the farm most every day when the weather was good, looked after caring for the hay and sold it himself, and had done that for several years. Sharkey, the complainant and conservator, who occupied the farm from March, 1918, to March, 1921, testified that Morris was not of sound mind, but said he came to the farm every day during those three years, most all the time by himself. Mrs. Summers, a witness for complainant, who was her tenant, testified he and his wife went in Mrs. Summers' car on December 10, 1922, to the Sisson home near Dana, Indiana, where Morris was then staying, and brought him to the home of his sister Mrs. Voorhees, in Paris, where he was staying at the time of the trial. The three persons mentioned testified to the circumstance of their going to

Sisson's and getting Morris, but we cannot regard it as of any value in arriving at a decision in the case. If there is any proof tending to show Mrs. Sisson or Henson importuned Morris to make the deeds, it is of such a character as to entitle it to little weight. There are quite as many circumstances tending to show the relatives of Morris, or some of them, were quite as determined that it should be made impossible for him to dispose of any of his property. There is no proof that Henson knew Morris was going to make the deeds at the time they were made. He was told to come to Kincaid's office about noon, January 2, 1922, to get Morris, and came back after him late in the same evening. He was not present when the deeds were made nor at any time when Morris was giving instructions about their preparation. The testimony of Morris' brother-in-law, Perisho, justifies the conclusion Morris went alone to Kincaid's office and asked him to prepare the deeds and will.

Without further referring in detail to what the witnesses for the respective parties testified, the evidence showed that due to advancing years and disease Morris was during the last five years physically weakened and his memory impaired. The test of mental capacity to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act. (*Wagner* v. *Chicago and Alton Railroad Co.* 265 Ill. 245.) Cases in which it was sought to set aside deeds on the ground of the mental incapacity of the grantor where the proof was similar to the proof in this case, or even stronger in some of them, and where it was held the evidence was insufficient, are: *Pillsbury* v. *Bruns,* 301 Ill. 578; *Fitzgerald* v. *Allen,* 240 id. 80; *McAyeal* v. *Hillison,* 291 id. 319; *Crosby* v. *Dorward,* 248 id. 471; *Bordner* v. *Kelso,* 293 id. 175. In *Sears* v. *Vaughan,* 230 Ill. 572, this court said impairment of memory by reason of advanced years does not, of itself, indicate lack of mental power to comprehend a transaction and dispose of property. The mind may be impaired in-

cident to old age and disease, but if the grantor is able to understand the nature and effect of the business he is engaged in and is exercising his own will his acts are not invalid. (*Essary* v. *Marvel*, 274 Ill. 576; *Kelly* v. *Nusbaum*, 244 id. 158; *McLaughlin* v. *McLaughlin*, 241 id. 366.) The medical testimony for the complainant was that Morris had hardening of the arteries; that the disease at first weakens the body and then progresses until the mind is impaired. They expressed the opinion Morris had been afflicted with the disease four or five years, that at the time of the trial he was in a state of senile dementia, and that he was in that state in January, 1922. Some of the doctors testified that in some cases the disease progresses faster than in others, and that in examining a man who has reached the stage of dementia it cannot be accurately determined how long he has been in that state. The doctors were better qualified to testify as to the diseased condition of Morris than lay witnesses and to state the effects of the disease, but it was held in *Austin* v. *Austin*, 260 Ill. 299, and *Carpenter* v. *Calvert*, 83 id. 62, and other cases, that the testimony of physicians upon the subject of mental capacity is entitled to no greater weight than that of laymen of good common sense and judgment. The condition of Morris which the doctors testified existed at the time of the trial was more than a year after the deeds were made. None of them testified as to his condition when the deeds were made, but from their examination of him just before the trial, and what some of them had seen of him before the deeds were made, they expressed the opinion he was not capable of making the deeds. None of them talked to him about his business or property. Some of them thought he knew how much property he had and his relatives and that he might be able to understand a deed if it was explained to him, but they expressed the opinion he was not mentally capable of transacting business. The proof shows that prior to the time the deeds were made Morris rented his farm

310—8

but looked after it and transacted business in connection with his farming operations. He kept a considerable bank account in his own name and went back and forth to his farm nearly every day, most of the time alone. It is true he did not rely on himself in transacting all his business but would get the assistance of his nephew, Voorhees, and others, but in our opinion this was more because of his physical disability than because of lack of mental capacity. His memory was somewhat impaired, and he apparently realized that; but that is to be expected with old age, and does not of itself indicate lack of mental capacity to transact ordinary business. At the same time he made the deeds he made a will. In his will he stated he had made the deeds and his reasons for making them. By his will he made bequests, aggregating $4500, to various persons, and directed that the remainder of his estate go to his heirs according to the Statute of Descent. The remainder of his estate consisted of 114 acres of land and $20,000 personal property, less any debts (and there do not appear to have been any) and the legacies mentioned. For many years prior to the time he made the deeds he told acquaintances he was going to give Mrs. Sisson and Henson part of his land. In making the deeds he did not deprive himself of the use and benefit of the land but reserved a life estate. The deeds were a voluntary settlement, reserving to the grantor a life estate, and required no greater mental capacity than is required to make a will. The burden of proof was on complainant to show Morris was mentally incapable of making the deeds. (*Campbell* v. *Freeman,* 296 Ill. 536; *McAycal* v. *Hillison, supra.*) We do not think the evidence was sufficient to support the decree.

Complainant invokes the rule that where the case is tried before the chancellor, who saw and heard the witnesses, and the evidence is conflicting, a reviewing court will not disturb the chancellor's finding of facts unless the decree is clearly against the weight of the evidence. That

rule has been announced in many cases, but we have also held in many cases that when this court, from a consideration of the whole record, is of the opinion the evidence did not justify the decree, it is our duty to reverse the decree. (*Smith* v. *Kopitzki*, 254 Ill. 498; *Bordner* v. *Kelso, supra.*) In our opinion the complainant did not prove a case which justified the decree on the ground of the mental incapacity of Morris to make a valid deed.

The decree is reversed and the cause remanded.

*Reversed and remanded.*