(No. 25075.—

George W. Wharton, Conservator, Appellant, *vs.* William H. Meyers, Appellee.

*Opinion filed June 19, 1939.*

STONE, JONES, and GUNN, JJ., dissenting.

LOUIS H. BURRELL, and DAVID M. BURRELL, for appellant.

NACK & NACK, (LOUIS A. NACK, of counsel,) for appellee.

Mr. JUSTICE FARTHING delivered the opinion of the court:

On December 21, 1936, Louis J. Foley, a widower, then seventy-eight years old, conveyed his improved farm of 266 acres situate in Jo Daviess county, Illinois, to his tenant, the appellee. Meyers executed a $2000 note, with Foley as surety, to one E. J. Andrews and gave Foley a mortgage securing payment of the balance of the purchase price, $11,000. This $11,000 mortgage note was made non-negotiable. Foley received the proceeds of the $2000 note. On November 22, 1937, a jury in the county court of Jo Daviess county returned a verdict by which it found that Foley, on account of old age and physical infirmities, was unable to care for his estate. It did not find him insane. Thereupon the county court appointed the appellant, George W. Wharton, Foley's conservator. Wharton, as conservator, filed the complaint in this cause in the circuit court of that county on February 1, 1938. The complaint charged that a fiduciary relation existed between the defendant Meyers and Foley; that Meyers obtained the conveyance of the 266-acre farm through fraud and undue influence; that he knew at the time the deed was made that Foley was of unsound mind and was incapable of

attending to his business affairs, and that the price paid was wholly inadequate. The prayer was for cancellation of the deed, reconveyance of the farm and an accounting of rent from Meyers during his tenancy from 1921 to 1936.

Meyers answered and denied the material allegations of the complaint. He stated that he was ready and willing to pay the $2000 note to Andrews and would have paid it before that time had the suit not been filed. Testimony was taken before the chancellor who found that Foley was capable of transacting his own business at the time the deed was made; that no fiduciary relation existed between him and Meyers, his tenant; that $13,000 was a fair price for the 266-acre farm and that the transaction was fairly made. The chancellor also found that the $11,000 mortgage note was made non-negotiable through mistake of the parties and ordered Meyers to pay the $2000 note to Andrews and to give a negotiable $11,000 mortgage note within thirty days. He retained jurisdiction of the cause and gave the parties leave to amend their pleadings to conform to his findings and the interlocutory decree.

Meyers amended his answer, paid Andrews the $2000 and delivered the $11,000 negotiable mortgage note to Wharton. The final decree contains a finding that the parties stipulated that Wharton was not to be prejudiced in any way by accepting this new $11,000 note, and it dismissed the complaint for want of equity. Wharton has perfected this appeal.

Meyers took no appeal and has not attempted to assign error in any way. Wharton has not raised any question as to the chancellor's findings and orders concerning payment of the $2000 note and the giving of a new negotiable $11,000 mortgage note. The result is that this appeal involves only the propriety of the chancellor's findings of the non-existence of a fiduciary relation, the absence of fraud and the competency of Foley to make the deed of the 266-acre farm to Meyers.

Foley lived with his family in Scales Mound, Illinois. He had two foster children but had not adopted them and had no children of his own. Meyers had occupied Foley's farm since 1921 and farmed the land under written leases until 1933. He continued as a tenant from year to year thereafter. The evidence shows that Foley had two opportunities to sell his farm. One was an offer from a physician to pay Foley $1000 a year for twenty-eight years on condition that the physician should get the farm without further payment if Foley died during that period. The other was Meyers' offer of $13,000, $2000 of which was to be paid to Foley in five days, $500 a year for four years and the balance of $9000 on March 1, 1941. Foley accepted this offer after having sought advice as to which of the propositions to accept. As stated above, Foley went surety for Meyers who borrowed $2000 from Andrews, which amount was paid to Foley, and Meyers and his wife executed a trust deed and a note for $11,000 made non-negotiable and secured by the trust deed. Later payment of $4200 was endorsed on the $11,000 note.

The issues are whether Foley had the mental capacity to convey his farm and whether there was a fiduciary relationship between the defendant and Foley. There were several witnesses, but all who testified as to Foley's physical condition agreed that previous to and at about the time of the transaction referred to he was somewhat feeble and had a shuffling walk. He had twice been overcome with heat and had pneumonia in 1926. His sight was impaired by cataracts. Two physicians testified that Foley had high blood pressure and kidney and heart trouble. One physician testified that Foley also had bladder trouble and one testified to the presence of albumen in the urine.

Four medical witnesses testified that Foley had *senile dementia*. Other witnesses, after detailing their opportunities for observation, expressed the opinion that Foley was of unsound mind and incapable of transacting ordinary

business. Some of the incidents upon which they based their opinions are as follows: One witness testified that upon his visit to the home of Foley, the latter directed his attention to his wife who was in bed, and said: "There is the old lady; she is going to die. She is crazy." This witness also testified that on more than one occasion Foley requested him to have the cashier of the bank in Scales Mound go to Foley's home at night to consult with him about business; that Foley talked about certain European nations without knowing or seeming to know what he was talking about. Other witnesses testified that Foley did not seem to understand the subjects he was discussing. Some witnesses noticed that he mumbled, and repeated words which had no apparent meaning and that he was excitable, especially when discussing politics and religion. One witness testified that Foley talked about being persecuted by his friends. Another witness testified that he was childish and foolish. Two ministers testified that Foley was changeable in his views. There was testimony that he let a contract for the construction of a corncrib for $150 more than another estimate submitted by a competent carpenter; that at times he would appear to be very religious and at other times he was profane. Among other characteristics which witnesses testified Foley exhibited were that he was erratic, had a poor memory and was sometimes despondent. There was testimony that Foley's wife, when she was competent, and the cashier of the bank heretofore mentioned, assisted Foley in the transaction of business.

Bearing upon the question of a fiduciary relationship, one or more witnesses testified that the defendant and Foley frequently conferred about the farm; that Meyers told Foley he would care for him if Foley would sell him the farm. One witness testified that about an hour after Mrs. Foley's funeral Meyers told Foley that he ought to deed the farm to him so the funeral expenses could be paid. Other witnesses testified that Foley seemed to have confi-

dence in Meyers. There was no other evidence to establish undue influence.

Two attorneys, and persons engaged in the retail grocery, hardware, automobile, feed and supply and the furniture and undertaking businesses, testified for defendant. All these witnesses had business dealings with Foley and related the circumstances of their conversations. Each expressed the opinion that Foley was of sound mind. Some of the incidents upon which they based this opinion were as follows: One testified that Foley told him of the two propositions he had for the sale of his farm. One offer was of $28,000 in payments of $1000 a year, but if Foley should die before all the payments were made the purchaser was to receive the farm. From other evidence it appears that at least two other provisions were incorporated in the proposition, providing two small payments, not related by this witness. The other offer was of $50 per acre for the farm. The witness testified that Foley asked his advice and he told him to accept the offer of $50 an acre, but to require a substantial down payment and payments on the principal each year, with interest on the unpaid balance. He said that Foley thanked him for his advice. He also testified that at times Foley "would get things kind of muddled" but at other times he was clear as to his dealings.

The undertaker who had charge of the funeral arrangements when Mrs. Foley died testified that, though Foley had advice from one or more other persons, yet he talked about the funeral arrangements for his wife, inquired the price of caskets, discussed the selection of one and decided upon an appropriate service. Based upon the conferences in question, the witness was of the opinion that Foley was able to transact business.

An attorney, who had been consulted by Foley and a physician as to a proposed contract between the physician and Foley, testified to various conferences. This attorney was, for a time, one of the counsel for the defendant in

this suit, but withdrew to become a witness. He was of the opinion that Foley was competent to transact business when he signed the contract and deed and, after the terms and provisions of the documents were explained to him, knew what he was doing. Another attorney testified to a conference with Foley in the former's office and, later, at the home of Foley. Foley told the witness he was without financial means and sought the attorney's advice as to what could be done about his transaction with Meyers. This witness was of the opinion that Foley was of sound mind when these consultations took place. The testimony of an automobile salesman related to the sales of cars to Foley for the use of his foster son. A new automobile was taken by the undertaker in an adjustment of the funeral expenses following Mrs. Foley's death.

Some of the facts and incidents related as tending to prove the mental incompetency of Foley, when analyzed, are consistent with mental competency. There was medical testimony that Foley had *senile dementia*. One physician testified that he had been suffering a gradual mental decline for probably six years prior to the early part of 1937. Another physician admitted that he had seen very little of Foley about the time the deed was made. Another witness who testified that Foley had *senile dementia* was the person who had made an offer on Foley's farm in 1936, which Foley rejected. Physicians are better qualified to testify as to a diseased condition than are lay witnesses, but the testimony of physicians upon the subject of mental capacity is entitled to no greater weight than that of laymen of good common sense and good judgment. *Sharkey* v. *Sisson*, 310 Ill. 98.

One witness who testified that he did not think Foley was mentally competent admitted that he had signed, as a witness, a will made by Foley in 1936, the year the farm was sold. Foley had stated that his wife was going to die and said that she was "crazy." She was incompetent, a

conservator had been appointed for her, and she died some time thereafter. The most that can be said of the language used by Foley on the occasion mentioned is that it was not in good taste even if true. Loose expressions and lack of intelligent comprehension of the conditions of certain European nations and other subjects under discussion would not necessarily be persuasive of one's mental incompetence to make a deed. Partial mental impairment, poor memory, excitability, irascibility, intermittent despondency, eccentricity and childishness may accompany advanced age and not be evidence of mental incompetence sufficient to invalidate a deed. (*Harrington* v. *Travis,* 349 Ill. 606; *Chance* v. *Kinsella,* 310 id. 515; *Campbell* v. *Freeman,* 296 id. 536; *Sharkey* v. *Sisson, supra.*) In some of the instances related by the witnesses for Wharton as a basis for believing that Foley was mentally incompetent the circumstances were slight and the observations limited.

There was evidence that Foley did, in fact, transact business. Some of the transactions were of a simple character but other acts required the exercise of judgment as, for example, the rejection of the offer of $28,000 in annual payments of $1000 for his farm. Various witnesses related specific instances of sales to Foley and of conversations with him as the basis for their opinions that he was mentally competent. The test of mental capacity to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act, and if he is able to understand the nature and effect of the business in which he is engaged, and is exercising his own will, his deed is valid. *McAyeal* v. *Hillison,* 291 Ill. 319; *Harrington* v. *Travis, supra; Sharkey* v. *Sisson, supra.*

There is no convincing evidence that a confidential relation existed between Meyers and Foley or that he took advantage of Foley. Foley was in debt and desired to sell the farm. He had a high regard for Meyers and expressed a desire that his tenant for fifteen years should have the

first chance to purchase the farm. The mere fact that Meyers was a tenant of Foley did not place him in a superior position. They consulted frequently about the farm. The evidence discloses that the terms for the rent were varied from time to time as farming conditions warranted. Foley did not depend upon the advice of Meyers solely in respect to the land. He sought the advice of a lawyer as to the two offers of purchase. A fiduciary relationship exists where there is special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the other. It exists where confidence is reposed on one side and resulting superiority and influence is found on the other. (*Johnson* v. *Lane,* 369 Ill. 135; *Niland* v. *Kennedy,* 316 id. 253; *Bordner* v. *Kelso,* 293 id. 175.) One of the incidents related to show that the defendant exerted influence over Foley was that Mrs. Foley had been opposed to selling the farm, and about an hour after her funeral the defendant told Foley he ought to deed it to him so that the funeral expenses could be paid. The date of this conversation was August 31, 1936, but the deed was not executed until December 21 of that year. However, the funeral expenses were adjusted within a week.

The witnesses for Wharton fixed the value of the land at from $70 to $90 an acre and those for Meyers at $45 or $50 an acre. The farm brought slightly less than $50 an acre. Some of the witnesses as to value were farmers who resided near the Foley farm. They were in a position to estimate farm values as well or better than were Wharton's witnesses. To warrant the setting aside of a contract for the sale of land, or a deed, on the ground of fraud for inadequacy of consideration the inadequacy must be gross. The mere showing that there was some advantage to the purchaser or grantee will not warrant the cancellation of a deed. *Van Gundy* v. *Steele,* 261 Ill. 206.

The chancellor saw the witnesses, and heard their testimony. He had a better opportunity to judge their credibility than has this court. Where a case is heard by the chancellor and the evidence is all, or partly, oral, it must appear that the decree is against the manifest weight of the evidence or that there is clear and palpable error before a reversal will be had. (*Dowie* v. *Driscoll*, 203 Ill. 480; *Biggerstaff* v. *Biggerstaff*, 180 id. 407.) We cannot say that the final decree is against the manifest weight of the evidence or that any palpable error was committed.

The decree of the circuit court of Jo Daviess county is affirmed.

*Decree affirmed.*

STONE, JONES, and GUNN, JJ., dissenting.