(No. 26950.—

EFFIE REDMON, Conservatrix, Appellant, *vs.* O. C. BORAH *et al.,* Appellees.

*Opinion filed March 16, 1943—Rehearing denied May 14, 1943.*

HARRY I. HANNAH, and THOMAS R. FIGENBAUM, for appellant.

FRED W. GEE, and HOMER KASSERMAN, for appellees.

Mr. JUSTICE MURPHY delivered the opinion of the court:

After a hearing of evidence, the circuit court of Jasper county dismissed plaintiff-appellant's complaint for want

of equity. The purpose of the action was to set aside a mineral deed executed by Charles Z. King and Sarah King, his wife, to defendant O. C. Borah, on the grounds of mental incapacity of the grantors, fraud in procuring the signatures and that the defendants unlawfully conspired to obtain the title. As alternative relief plaintiff prayed for an accounting. A freehold being involved the case comes direct to this court.

The evidence shows that on April 21, 1936, Charles Z. King owned the 130 acres described in the mineral deed and on that date he and his wife executed an oil and gas lease, reserving as royalty the usual one-eighth part. The Pure Oil Company is the present holder of that lease, is operating under it and its validity is not involved in this case. The royalty proceeds are held pending the determination of the case.

On March 26, 1937, King and wife executed the deed in question, conveying to Borah an undivided one-half interest in grantors' mineral rights in said land. Borah paid the Kings $1000 in cash for the deed and covenanted to pay $650 more, if and when oil should be produced in paying quantities. Oil was not produced from this land until March 1940. This suit was started September 15, 1941. Prior to the beginning of the suit, Borah made a tender of $650 additional consideration which was refused. Plaintiff tendered back the $1000 first paid and this Borah refused.

Other pertinent dates and undisputed facts are that on April 5, 1937, Charles Z. King was adjudged an incompetent person and Effie Redmon, a daughter, was appointed conservatrix of his estate. He died on November 12, 1937, leaving a will, executed in 1930, devising the real estate in question to his wife, Sarah King, which will was duly admitted to probate. On August 23, 1941, Sarah King was adjudged an incompetent person and Effie Redmon was appointed conservatrix of her estate. During the pendency of this appeal, Sarah King died and the representative

of her estate has been substituted and the beneficiaries made parties.

The complaint charged that Charles Z. King and Sarah King were mentally incapable of executing the mineral deed, that it was obtained through fraud and misrepresentation pursuant to a fraudulent and unlawful conspiracy entered into by the defendants. It was also alleged that the consideration was inadequate. Defendants' answer traversed all of such allegations.

The evidence was heard before the chancellor and he found that the Kings were mentally capable of making the mineral deed, that there was no fraud or misrepresentation and that the consideration paid and to be paid was fair and adequate. A decree was entered and this appeal followed.

At the time the deed in question was executed, Charles Z. King was eighty-three and Sarah King was seventy-nine years old. In earlier life they resided on and farmed the land involved in the deed. It was located about six miles from the village of West Liberty in Jasper county. According to all the evidence Charles Z. King was considered to be a successful farmer and possessed of average business ability. About 1922 he retired from active farming and took up his residence in West Liberty where he operated a hardware store. He owned a house and other property in West Liberty. He sold the hardware business in 1927 and was never again actively engaged in any business.

All parties agree that prior to 1930 Charles Z. King was an intelligent, active and alert businessman, who took an active interest in civic and church affairs and was fond of visiting and friendly conversation. In that year he suffered a stroke which affected him both physically and mentally. The evidence on the issue of his mental capacity at and for some time prior to the execution of the deed is conflicting.

Twenty-one witnesses testified on this point for plaintiff and stated that in their opinions King was not competent to transact ordinary business on March 26, 1937. The testimony of these witnesses is entitled to considerable weight for most of them were friends of long acquaintance, neighbors and tradespeople, who had frequent opportunity to observe King during the last five or six years of his life. They each related incidents of their own observation bearing on his mental competency and ability to transact business. Many of the incidents are trivial and inconclusive, but they have a common theme. They all tend to prove that after the stroke he became moody, irritable, seclusive and childish, and that he did not talk very much, that he appeared dazed, that his speech was slow, thick and incoherent, and he walked with a shuffling, halting gait. He was very forgetful, seldom could remember the articles such as groceries he was to buy and did not seem to know much about the prices; at times he wore his shoes on the wrong foot, and could not recognize people he knew. Some witnesses testified he inquired about the location of the bank which had been closed for over a year. Others testified to having seen him urinate in places where he was exposed to public view. A witness who purchased a lot and garage building from him prior to 1930 testified that after 1931 he came to the garage frequently and would turn the shop radio on and appear to be listening when there was nothing but static, that at times he turned on the power machinery and when cautioned not to do it again he would become offended and had to be watched like a child. This witness also related an incident when King falsely accused certain persons, including members of his own family, of turning him in to the game warden. A tenant on King's farm testified that he insisted on selling him his share of some beans for less than they were worth.

Six witnesses testified for defendants as to the mental capacity of Charles King and stated that in their opinions

he was mentally capable of transacting ordinary business on March 26, 1937. One of the witnesses was a granddaughter of Charles and Sarah King, who frequently visited in the King home and was there on a visit the Sunday preceding March 26, 1937. She stated that her grandparents had talked about selling the royalty ever since they leased the ground to the Pure Oil Company and that on the Sunday she was there, the members of the family, including her mother, Nora Cunningham, her aunt, Effie Redmon, and her grandparents, all talked about selling royalty; that her grandparents had several offers from royalty buyers but none had offered more than $500 for one half of the royalty. She testified that her grandparents were both mentally capable of transacting ordinary business on that day. The husband of this witness was present and testified that Charles and Sarah King acted as normal people of their age and that in his opinion they were both capable of transacting ordinary business on March 26, 1937.

Nora Cunningham, a daughter of Charles and Sarah King, testified that during 1936 and 1937 she visited her parents every week and that in her opinion they were both capable of transacting ordinary business on March 26, 1937. This witness testified that she was in the King home on the Sunday prior to March 26, 1937, and that on that and other occasions she had discussed selling royalty with her father and mother; that it was a common topic of conversation at that time; that on the afternoon of March 26, 1937, the defendant, O. C. Borah, accompanied by Charles Z. King and Sarah King came to her home and Borah told her that her father had sold the royalty and asked her to go with them to Newton. Mrs. Cunningham further testified that she went with them; that they drove to the home of her sister, Effie Redmon, the plaintiff-conservatrix, at Newton, and they all went to the office of Ben Lowe, a notary public. She also testified Ben Lowe then prepared the mineral deed in question, read it over to them. that

her father and mother signed it at that time and that she and Mrs. Redmon signed as witnesses. Borah delivered his check for $1000 to her father and he turned it over to Effie Redmon for deposit. The witness further testified that they were all well pleased with the deal.

Arthur Cunningham, the former husband of Nora Cunningham, testified that prior to March 26, 1937, he saw Charles King once a week or more and that Charles King visited in the Cunningham home for a month in November and December of 1936. During this visit King talked about selling some royalty and said he thought he should sell some because the money would do him more good at that time than later. In his opinion Charles King was capable of transacting ordinary business on March 26, 1937.

The evidence as to the mental capacity of Sarah King is also conflicting. Eight of plaintiff's witnesses testified that in their opinions she was mentally incapable of transacting ordinary business in March of 1937. These witnesses were members of the family and close friends of long acquaintance who had a good opportunity to observe her mental and physical condition at that time. They testified that she was a clean and efficient housekeeper, that she was uneducated, that she could not read or write except to sign her name but that she was intelligent, except for book knowledge. She raised seven children and was capable of running her own household and continued so until near the time of her trial. The witnesses testified that she had little business to transact for the reason her husband attended to all the business for both. He shopped for groceries and other household necessities while she managed the home. After his death other persons shopped for her but she continued to maintain her own home. The witnesses further testified that Mrs. King became feeble during the last years of her life; that she became absent-minded, and that while her memory was keen as to events of the remote past it was faulty as to recent events and

she would frequently ask the same questions over and over again; that it was hard for her to assimilate new ideas, and that she relied on her husband for advice in business matters.

Seven of defendants' witnesses testified that in their opinions Sarah King was mentally capable of transacting ordinary business on March 26, 1937. This was the opinion of the daughter, Nora Cunningham, who accompanied her parents at the time the deed was signed, and of the granddaughter who visited with the Kings on the Sunday preceding March 26, 1937. The husbands of this daughter and granddaughter also testified to the same effect.

Phillip N. Coper, an employee of the land department of the Pure Oil Company, talked with Mrs. King on April 5, 1941, in regard to two right-of-way deeds which she signed on that day, and he talked with her about three months later in regard to damages to the farm caused by oil operations, and he testified that in his opinion she was capable of transacting ordinary business. Claude M. Hall, an employee of the land department of the Pure Oil Company, testified that he called on Mrs. King several times and that on May 8, 1941, she signed a divisional order; that she asked questions in regard to the order and he explained its effect to her. This witness testified that Mrs. King was competent at the time he talked with her. Warren Crippen, who took the acknowledgment of the signatures of Charles and Sarah King to the Pure Oil Company lease in April of 1936, and who saw them only once, testified that he did not see anything abnormal in the actions of either.

Certain circumstances which have a bearing on the mental competency of this aged couple should be mentioned. Until a conservatrix was appointed in April, 1937, Charles Z. King attended to most of his business matters. They were of a minor character and consisted of renting his farm,

collecting the rents, purchasing the family necessities and issuing a few checks in payment of things purchased. His physical condition was weak but he made almost daily trips of a block or two to make his purchases.

On March 11, 1937, Charles Z. King and wife executed a mineral deed conveying to Charles Warren and defendant T. E. Warren an undivided one-half interest of the mineral rights in this same land. The Warrens paid $400 for the deed. Within a few days thereafter the plaintiff and possibly other children of Charles Z. King complained that the consideration paid was inadequate and word was sent to the Warrens that they should pay $400 more or reconvey the property. Litigation was threatened if something was not done immediately and as a result the Warrens reconveyed the mineral rights to King and the $400 was returned to them. It appears that the sole objection of the children was the inadequacy of the consideration. Warren testified he reconveyed because other mineral rights could be bought at the same price and he would rather take that course than to counter the Kings.

In April, 1941, about thirty days after the development of the first oil well on the King land, Sarah King executed seven royalty deeds conveying to each of her seven children an undivided one-sixteenth part of the royalty and retained a one-sixteenth part for herself. In April, 1941, she executed a pipeline right-of-way deed and in May she signed divisional orders in reference to the payment of the royalties. Both of the aforesaid transactions occurred in the presence of plaintiff and evidently received her sanction and approval.

It is strikingly strange that the two daughters, Mrs. Cunningham and Mrs. Redmon, should be in company with their parents when they signed the mineral deed on March 26, 1937, and witness their signatures without protest, and a little more than four years thereafter one, in her representative capacity as conservatrix of her mother's

estate, should start this suit and plead the mental incompetency of her parents at the time they executed the deed, and on the trial the other daughter, Mrs. Cunningham, should testify that both were mentally capable of making the deed on that date. Perhaps Mrs. Redmon's appearance in her representative capacity in this suit prevented her from testifying and expressing her attitude but it would seem reasonable that if she had considered her parents mentally incompetent to make the deed on March 26, 1937, she would have at least refused to witness their signatures and made protest against delivery of the deed and acceptance of the $1000 from Borah. The evidence is she deposited the money in her father's account.

Inadequacy of consideration alone is not sufficient to set aside a deed but is a circumstance to be considered. The plaintiff introduced the testimony of five witnesses, who had sold royalties in the vicinity of the King farm, to prove inadequacy of consideration. One of these witnesses testified that she owned 86 acres adjoining the King farm on the west and that in August, 1937, she sold one half of her royalty for $2500. Another witness owning 93 acres west of the King farm testified that he had sold one half of his one-eighth royalty on August 23, 1937, for $2000. A neighbor owning 200 acres to the south of the King farm testified that he sold one half of his one-eighth royalty on June 14, 1937, for $4400. A witness owning 20 acres adjacent to the King farm on the east testified that on August 10, 1937, he sold one half of his royalty for $500. Another witness testified that he purchased three-hundredths part of the King royalty on August 11, 1941, for $1350.

Witnesses for the defendants testified that when Charles and Sarah King executed the oil and gas lease on April 21, 1936, assigned to the Pure Oil Company, no oil wells had been drilled in Jasper county and the nearest production was about ten miles south of the King land. The

King farm was near a block of land which was being leased by the Puru Oil Company and others for the purpose of exploring for the presence of gas and oil thereunder. The value of the mineral rights pending the discovery of oil and gas was speculative. The fair cash value of royalty was likely to fluctuate violently with the discovery of oil. The plaintiff's evidence relates to sales three to five months after the King sale. H. T. Payne testified for the defendants that he was in the real-estate loan and abstract business and that in 1936 and 1937 he was engaged in the buying of royalties for others in the vicinity of the King land. He testified that on July 5, 1936, he purchased royalty about one half mile east of the King farm for $2 a royalty-acre, and that on March 5, 1937, he purchased royalty lying about one and one fourth miles south of the King farm for $10 per royalty acre. The witness testified that royalty was selling in the vicinity of the King farm on March 26, 1937, for about $10 an acre and that this was its fair cash market value. He further testified that Effie Redmon came to his office in the early part of 1937 and offered to sell him a one-half interest in the royalty on the Charles King land for $15 a royalty-acre.

E. C. Alblinger, a banker, testified that he had bought and sold several pieces of royalty in the vicinity of the King farm during the early part of 1937 and that the fair cash market value for royalty in that neighborhood in March, 1937, was about $15 per royalty-acre. On February 10, 1937, this witness purchased an undivided one-half of the royalty on 80 acres near the King farm for $320 and on March 15, 1937, he bought a one-half interest under a 130-acre farm located within a mile east of the King land for $959. On March 2, 1937, the witness purchased an undivided one-fourth of the royalty under 115 acres for $200. On March 9, 1937, the witness purchased other royalty in this vicinity paying $100 for three sixteenths of 40 royalty-acres.

Curt Gustin testified that his father sold one half of the royalty under his 130-acre farm lying about one half mile southeast of the King land on March 19, 1937, for $1300.

Ottie Richards testified that he sold one half of the royalty under his 80-acre farm in this vicinity on March 25, 1937, for $600.

Several other witnesses testified for the defendants that they bought and sold royalties in the vicinity of the King farm during the period from December, 1936, to May, 1937, for prices ranging from $5 to $20 per royalty-acre. The granddaughter of Charles and Sarah King testified that the best offer her grandparents had for the royalty prior to the sale was $500. It is apparent from the evidence that the finding in the decree that the consideration was fair and adequate is not against the manifest weight of the evidence.

There is no evidence in the record of any fraud, misrepresentation, undue influence, duress or conspiracy on the part of the defendants. The defendant McCormick was an equal partner in the purchase and the defendant T. E. Warren, who acquired a fractional interest, was a party to the mineral conveyance of March 11, 1937, which was returned, but there is no evidence that they schemed or conspired to defraud the grantors.

The test of mental capacity to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act, and if he is able to understand in a reasonable manner the nature and effect of the business in which he is engaged and is exercising his own will, his deed is valid. (*Wharton* v. *Meyers,* 371 Ill. 546; *McAyeal* v. *Hillison,* 291 id. 319; *Essary* v. *Marvel,* 274 id. 576; *Kelly* v. *Nusbaum,* 244 id. 158; *Perry* v. *Pearson,* 135 id. 218; *English* v. *Porter,* 109 id. 285; *Willemin* v. *Dunn,* 93 id. 511; *Titcomb* v. *Vantyle,* 84 id. 371.) That he has such capacity may be shown by proof that he is capable of transacting ordinary business

affairs wherein his interest is involved. *Ring* v. *Lawless,* 190 Ill. 520; *Greene* v. *Maxwell,* 251 id. 335.

Proof of old age, partial mental impairment, poor memory, excitability, irascibility, intermittent despondency, eccentricity and the childishness which may accompany advanced age, is not sufficient to set aside a deed where it is shown that the grantor had sufficient mental capacity to comprehend the nature of the transaction and to protect his own interests. . (*Bordner* v. *Kelso, 293* Ill. 175; *Harrington* v. *Travis,* 349 id. 606; *Chance* v. *Kinsella,* 310 id. 515; *Campbell* v. *Freeman,* 296 id. 536; *Sharkey* v. *Sisson,* 310 id. 98.) The law is that old age, eccentricity or even partial impairment of mental faculties is not necessarily sufficient to set aside a deed and if the grantor had sufficient mental capacity to comprehend the nature of the transaction and to comprehend his own interests, the deed will not be set aside for want of mental capacity. *McLaughlin* v. *McLaughlin,* 241 Ill. 366; *Sears* v. *Vaughan,* 230 id. 572; *Baker* v. *Baker,* 239 id. 82.

The chancellor saw the witnesses and heard them testify. He had a better opportunity to judge their credibility and the weight to be given their testimony than has this court. Where a case is heard by the chancellor and the evidence is all, or partly, oral, it must appear that the decree is against the manifest weight of the evidence or that there is clear and palpable error before a reversal will be had. (*Dowie* v. *Driscoll,* 203 Ill. 480; *Biggerstaff* v. *Biggerstaff,* 180 id. 407.) We can not say that this decree is against the manifest weight of the evidence or that any palpable error was committed.

The decree of the circuit court of Jasper county is affirmed.

*Decree affirmed.*