(No. 30324.

THEODORE C. SCHNOOR *et al.*, Appellees, *vs.* JOHN J. TER-
LEP *et al.*—(JOHN J. TERLEP, Appellant.)

*Opinion filed January 22, 1948.*

JOHN P. HALEY, of Joliet, for appellant.

BARR & BARR, of Joliet, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

The plaintiffs, Theodore and Theresa Schnoor, parents
of Alma Schnoor Terlep, deceased, commenced this action
in the circuit court of Will County against the defendants,
John J. Terlep, their son-in-law, and Ruth Rosell, to set
aside a deed whereby Alma Terlep, the owner of record of
the Terlep family residence, purported to create a joint

tenancy by conveying the premises to Ruth Rosell who immediately reconveyed to John and Alma Terlep as joint tenants. The complaint is founded on the alleged mental incompetency of the grantor and undue influence. Ruth Rosell filed a disclaimer. John Terlep, hereinafter referred to as the defendant, denied the material allegations of the complaint. The cause was referred to a master who found against plaintiffs on the issue of undue influence but in their favor on the question of mental incompetency, and, accordingly, recommended that the deed be declared void. In addition to confirming the master's finding that Alma Terlep was mentally incompetent when she executed her deed, the chancellor found that the deed had been procured by means of undue influence. From a decree setting aside the deed, defendant prosecutes a direct appeal, a freehold being necessarily involved.

The property here involved is lot 14 in block 7 in First Unit Cherry Hill Subdivision, New Lennox Township, Will County. Lots 15 and 16, adjoining to the east, are owned by plaintiffs and they have resided there for many years. Following the marriage of their daughter, Alma, to John Terlep in August, 1928, plaintiffs purchased lot 14, apparently in April, 1930, and thereafter they erected a substantial two-story house on the premises. By a real-estate contract dated November 19, 1931, plaintiffs agreed to sell the property to Alma Terlep for a consideration of $15,000, purchaser to have immediate possession of the premises and to be entitled to a deed when the purchase price was fully paid. Reciting receipt of a down payment of $500, the contract provided for the payment of the balance in monthly installments of $100 each, commencing February 1, 1932, with interest at five per cent per annum, payable semi-annually. While the evidence relative to this and subsequent financial transactions between the parties is most sketchy, a fair statement is that by January 1, 1938, only one payment of $47.16 had been made toward the reduc-

tion of principal and plaintiffs had waived several years' interest; that between January 1, 1938, and July 1, 1939, monthly installments of $100 were paid as per contract, and that in the next two and one-half years, in addition to payment of interest, the principal was reduced by $13,900 and the purchase price paid in full. While Alma Terlep paid all installments in cash, it is not clear whether the sums so paid were derived from her own income or were furnished to her by defendant. In any event, the final payment was made December 8, 1941, and the next day Alma Terlep, at her insistence, took title in her own name by a warranty deed from plaintiffs. The east 30 feet of lot 13, the adjoining lot to the west, was acquired by John and Alma Terlep as joint tenants at some undisclosed date from a source other than her parents. No dispute exists with regard to this parcel.

In connection with the income of defendant and his wife and the savings accumulated by them, reference must be made to the Joliet Beverage Company. In 1937, and for many years prior thereto, Theodore Schnoor engaged in the business of distributing beer under the name and style of the Joliet Beverage Company and also owned the warehouse in Joliet from which the business was conducted. For several years prior to 1928, Alma Terlep worked for her father and after her marriage she continued in his employ. She was in charge of the books and records of the business. Schnoor was not well during the winter of 1937-38 and, pursuant to an oral understanding, new arrangements were made concerning the operation of the business. Whether the business was sold or rented to Alma Terlep or defendant, or both of them, is not at all clear, and the chancellor made no findings in this respect. Mrs. Schnoor testified that the business was rented to her daughter for $200 a month, while her son-in-law, the defendant, maintains the business was sold to him and his wife. The few facts that stand out are that the stock on

hand and the trucks were actually sold; that commencing in 1938 the business was conducted under the name of John Terlep doing business as the Joliet Beverage Company; that Alma Terlep made cash payments of $200, later reduced to $150, per month, to her mother, although the receipts recite the money was given in payment on the house; that the payments continued for several years; that Schnoor continued to own the warehouse; that both defendant and his wife took an active part in the business, and that the business was quite profitable, enabling defendant or his wife, or both, to pay about $15,000 on the house in four years' time and to accumulate savings of at least $27,000 by February, 1943.

The record further discloses that, from the time she was eighteen years old, Alma Terlep was afflicted with chronic nephritis, a form of kidney trouble commonly known as Bright's disease, which became progressively worse with the passing of the years. By 1942, when she was about thirty-seven years of age, the disease had reached a very advanced stage and was accompanied by secondary anemia and uremic poisoning. Dr. Charles Curtis who had been treating her held out no hope, and Dr. Walter J. Fahrner was called into the case on November 27, 1942. He immediately ordered the patient removed to a hospital for observation and treatment and continued as her physician until she died. Defendant's wife remained at the hospital until December 31, 1942, when she returned home. Thereafter, she was virtually bedridden and a nurse, Catherine Diederich, was in constant attendance.

By her last will and testament executed on January 12, 1943, at a time she was admittedly of sound mind, Alma Terlep named her father as executor, devised the premises in question to her parents, the plaintiffs, and devised and bequeathed the rest of her estate to her parents, her sister and her sister's childen, except for her wedding ring which she left to her husband. In this connection, it is interesting

to note that Alma Terlep may very well have devised her real estate to her parents not only because of natural love and affection but also in recognition of the very substantial financial benefits accruing to herself and her husband from their acquisition of her father's business. The parents, of course, derive their standing as plaintiffs in the present cause as devisees under the will.

Alma Terlep's health continued to fail and, on March 4, 1943, she suffered a severe heart attack which she was not expected to survive. By March 6 she was out of danger, but only temporarily, for even with sweat treatments to remove accumulated poisons, sedatives, the use of oxygen and other administrations, her life could not be prolonged beyond March 18, when she died.

On Sunday, March 7, 1943, defendant discovered that $27,000 in cash was missing from the house. Learning that plaintiffs had taken possession of the money about a month earlier at the direction of his wife, defendant demanded its return. At first, plaintiffs refused to return the money box, whereupon defendant refused to permit them to see their dying daughter. In addition, he consulted with two attorneys, his present counsel and Oscar R. Laraway, and prevailed upon Dr. Fahrner, who was also Theodore Schnoor's physician, to assist in obtaining the return of the money. By Tuesday, March 9, the $27,000 had been returned and plaintiffs were again allowed to visit their daughter. Subsequently, in October, 1943, in a second proceeding brought by Schnoor, as executor of his daughter's will, against defendant, to recover the $27,000 as an asset of Alma Terlep's estate, the county court held that the money was not part of the estate. Apparently, that litigation has not been concluded.

The deed here under attack, dated March 8, 1943, was not executed on that day but at some later unascertained date on or prior to March 11, 1943, when it was recorded. At defendant's direction, the deed was prepared by his

attorneys on March 8 and, because Alma Terlep was undergoing sweat treatments and was extremely weak, it was two or three days before Dr. Fahrner would permit the lawyers to see her. Laraway, the attorney, called as a witness for plaintiffs, testified that he explained the nature of the instrument to Alma Terlep and she indicated her understanding by nodding her head; that she signed her name without assistance; that, in response to his question as to whether it was her own free act, she again nodded her head and indicated her assent by the look in her eyes, and that, during the whole proceeding, she spoke not a single word and had all the appearance of being a sick woman.

Seeking a reversal, defendant contends that the decree is contrary to the law and the evidence. In addition, defendant charges that both the master and the chancellor erred in refusing to admit in evidence a pretrial deposition of Dr. Fahrner. The deposition, dated September 10, 1943, was taken at plaintiffs' instance and Dr. Fahrner was examined as an adverse witness. The doctor's testimony not being helpful to plaintiffs' case, the deposition was never filed with the clerk of the circuit court. Prior to the trial, Dr. Fahrner died and defendant, never having taken a deposition from the doctor, sought to introduce in evidence an unsigned copy of the deposition which plaintiffs had taken. For the reason that the deposition was never enclosed, sealed up and filed with the clerk of the court in accordance with the requirements of sections 30 and 31 of the Evidence Act, (Ill. Rev. Stat. 1947, chap. 51, pars. 30, 31,) it was clearly informal and insufficient. No error was committed by its exclusion.

Although the decree is attacked as being contrary to both the law and the evidence, as concerns the question of mental incompetency there is no dispute in regard to the applicable law. The law presumes that the grantor of a deed was of sound mind when he executed it and the

burden of overcoming the presumption falls upon the party seeking to establish the grantor's incapacity. (*Johnson* v. *Lane,* 369 Ill. 135; *Stephens* v. *Collison,* 330 Ill. 48; *Campbell* v. *Freeman,* 296 Ill. 536.) Furthermore, as distinguished from entering into contractual obligations with an adversary, a person is competent to dispose of his property by deed or will if he is capable of understanding the nature and effect of his act. (*McGlaughlin* v. *Pickerel,* 381 Ill. 574; *Johnson* v. *Lane,* 369 Ill. 135; *Harrington* v. *Travis,* 349 Ill. 606.) Defendant's principal contention is that plaintiffs failed to sustain the burden of proof of showing his wife was mentally incompetent when she executed the deed. Stated otherwise, defendant maintains that the chancellor's finding as to absence of mental capacity is contrary to the manifest weight of the evidence.

No useful purpose will be served by a detailed exposition of the testimony. Generally speaking, the evidence relative to the issue of mental incompetency is contradictory. Most of the witnesses produced by the parties were relatives and even some of the few so-called impartial witnesses were not entirely impartial. A resumé of the evidence adduced in behalf of plaintiffs shows that Dr. Curtis testified that Alma Terlep was seriously ill in September, 1942; that her long-existing condition of chronic nephritis had become progressively worse and was accompanied by severe secondary anemia; that when it developed she was beyond the help of his administrations, he so advised her husband; that he withdrew from the case when Dr. Fahrner was called in late in November, and that he did not see the patient thereafter. The doctor further testified that in the last few weeks of a terminal case of chronic nephritis, the patient is usually extremely weak, blind or partly so, in a comatose state and occasionally suffers convulsions resulting from uremic poisoning. In response to a hypothetical question, Dr. Curtis answered that Alma Terlep was not, during the period from March 8 to March 11,

mentally capable of comprehending the nature and effect of her acts or of transacting ordinary business.

Theresa Schnoor related that her daughter was in a coma on Christmas Day, 1942; that, in the two months prior to the heart attack on March 4, 1943, her eyes held a glassy stare and sometimes she could not see; that, on March 6, she observed that her daughter's feet were gangrenous, and that, on and after March 9, Alma never opened her eyes or said anything during any of the daily visits. Plaintiff's daughter, Marguerite Nellis, testified she visited her sister daily from March 4 to March 10, inclusive, and, also, on March 13 and 16; that, on and after March 6, she was never able to arouse Alma even though she made numerous attempts by speaking to her, shaking her and lifting her eyelids to expose her eyes to the light; that she had gangrene on her arms and feet, and occasionally vomited; that, on March 7, in response to a question as to whether their parents should return the money, the only answer she could elicit was an unintelligible "m-m-m," and that, thereafter, upon all her visits, her sister was in a coma. Theodore Schnoor did not testify.

Lena Miller, Mrs. Schnoor's sister-in-law, visited defendant's wife on March 5, 9 and 13. Her testimony was to the effect that, on March 5, Alma was in a coma, had difficulty in breathing, was unable to take nourishment, and did not respond to attempts at conversation but only mumbled. Waving a hand in front of her open and fixed glassy eyes produced no results. On the next visit, she did not enter the sick room, defendant being unable to arouse his wife. The witness further testified that, on March 13, the patient was in a coma and critically ill. Another relative, Agnes Ray, Theodore Schnoor's niece, testified she saw her cousin on March 6 and 7, and that the latter neither opened her eyes nor responded to attempts at conversation and appeared to be very ill. Joseph Petnuch, an impartial witness, testified that he saw Alma Terlep briefly

on March 11 and that her husband was unable to arouse her at this time. To much the same effect was the testimony of Rose Jursinic, an employee and confidant of Alma Terlep and a friend of the plaintiffs. She stated that she worked at defendant's residence on Sunday, March 7, and observed that, in the morning, defendant interrogated his wife with respect to the missing $27,000; that, shortly thereafter, Alma became sick and vomited, and that in the afternoon, no one, including herself, Dr. Fahrner, defendant or defendant's brothers, was able to arouse the patient even though they called to her, shook her and pushed back her eyelids.

Defendant has at all times asserted that his wife was mentally competent to and including the day of her death. His contention that the chancellor's finding is contrary to the manifest weight of the evidence is grounded on the testimony of five close relatives and three other witnesses. The testimony of defendant's three brothers, his sister and a sister-in-law may be briefly summarized. Louis Terlep, who frequently saw defendant and his wife, and Frank Terlep, who had not seen Alma for several months, both testified that they visited her on Sunday, March 7, and again the following Sunday; that, on both occasions, Alma was awake when they entered the room, recognized her visitors and engaged in rational conversation, and that she was able to see and her eyes looked normal. Joseph Terlep, another brother, and Anne Terlep, his wife, gave much the same testimony with respect to their visit on March 12, adding that Alma could tell time from her wrist watch and was able to compare it with a clock in her room. On the afternoon of Wednesday, March 10, Louis and Joseph Terlep and Anna Ferguson, defendant's sister, were all at the house. The three testified that their sister-in-law was not in a coma, but was conscious, recognized them, talked intelligently, and was able to see and tell time. Each had seen Alma a number of times between September, 1942, and

March, 1943, and had never found her unconscious or afflicted with blindness of any degree.

Defendant places particular emphasis on the testimony of Oscar Laraway, one of the lawyers who represented him in the execution of the deed, Dr. Fahrner, his wife's physician, and Catherine Diederich, the nurse,—all of whom he designates impartial witnesses. The testimony of his lawyer, Laraway, called as a witness for plaintiffs, has already been related. Miss Diederich testified that she did not know any of the parties until she was called into the case by Dr. Fahrner on December 31, 1942; that, thereafter, she lived at Terlep's house continuously until March 18, 1943; that Mrs. Terlep was always conscious and never in a coma, not even on the day she died; that the patient always recognized her and was never blind, or partially blind, although she did not read after the heart attack; that she never saw plaintiffs or any of their witnesses conduct any tests as to Alma's eyesight; that the sick woman always talked intelligently and rationally, and, more particularly, on the morning of March 7, she said "Yes" following her reply of "m-m-m" in response to Mrs. Nellis's question concerning her wishes with regard to the return of the money, and that, on one occasion, the patient had refused to speak to Mrs. Nellis when the latter had failed to visit her for three or four days. Plaintiffs attempted to impeach the witness by confronting her with her prior testimony in the probate proceedings. The nurse had previously testified that Alma sometimes refused to speak or open her eyes when visitors were present because they bothered her with the monotonous regularity of their inquiries as to her health and wore her out, an admission not materially at various with defendant's contention of mental competency.

A transcript of the testimony given by Dr. Fahrner in 1943 in the course of the probate proceedings was admitted in evidence, although the exhibit had previously been ex-

cluded by the master. In the earlier litigation, the doctor had related that when he first examined Alma Terlep late in November, 1942, she was in the final stages of chronic nephritis, virtually a medical derelict; that tests conducted by him at the hospital indicated perfectly normal vision; that the patient was never blind or in a coma; that her eyes were extremely white only because of acute anemia and this did not affect her eyesight; that her mind was particularly clear at all times; that she was able to comprehend her acts and knew what she was doing; that three days after the heart attack she was no worse than prior to her seizure; that he talked to her on March 8 with regard to the return of the money, and that a few days later he found her filing her fingernails and cautioned her against over-exertion. Additionally, it appears that Dr. Fahrner took an active part in the return of the $27,000; that, on Monday, March 8, on information supplied by a lawyer, presumably one of defendant's attorneys, he told Theodore Schnoor he had committed a penitentiary offense and suggested restitution, and that he acted as Schnoor's emissary in ascertaining Alma's wishes about the matter. Further exhibits show that Alma Terlep worked on income tax returns at the end of February and during the first few days of March; that, on March 3, she wrote out two checks which were signed by her husband, and that, on March 9, she signed a typewritten statement directing her parents to return the money.

The evidence being highly contradictory, the exact status of Alma Terlep's mental condition during the period from March 8 to 11, 1943, cannot be adjudged with absolute certainty, especially from a reading of the cold and unresponsive record. On the other hand, it is undisputed that the deed dated March 8, 1943, was executed seven to ten days before the grantor died, at a time when she was in the absolute final stages of chronic nephritis and suffering from severe secondary anemia and uremic poison and

that the deed is directly opposed to her will made only two months earlier. Likewise, it is uncontroverted that it was not until March 7, 1943, that defendant learned his wife had directed her parents to take possession of the $27,000 in cash and that immediately thereafter defendant had the deed in question prepared by his attorneys. These circumstances, taken together with the testimony that, during the period from March 7 to March 14, Alma Terlep did not recognize or speak to visitors and was in a coma, make it abundantly clear that plaintiffs' evidence fully substantiates their allegation of mental incompetency. Furthermore, it is equally clear the finding of both the master and the chancellor that defendant's wife was without the prerequisite mental capacity to dispose of her property by deed is not contrary to the manifest weight of the evidence. Upon principles so well established as to require no citation of authorities, we must once again observe that where a cause is heard before a master, the findings of the master, although not to be accorded the weight of a jury verdict, are advisory and thus entitled to much consideration. The master who saw and heard the witnesses testify had the best opportunity to judge their credibility. While it is true that in a chancery case the facts are found by the chancellor and the master's report is only *prima facie* correct, where the master's conclusions have been approved by the chancellor, we are not justified in disturbing those findings when they are not manifestly against the weight of the evidence.

Our disposition of the issue of Alma Terlep's mental capacity renders unnecessary a consideration of the question of undue influence.

The decree of the circuit court of Will County is affirmed.

*Decree affirmed.*