*In re* ESTATE OF JOHN A. CUNNINGHAM, a Disabled Person (John A. Cunningham, a Disabled Person, Plaintiff-Appellee and Cross-Appellant, v. Reba F. Watson *et al.*, Defendants-Appellants and Cross-Appellees).

Fourth District No. 4—90—0203

Opinion filed December 28, 1990.

Eric S. Pistorius, of Jerseyville, for appellants.

Lee W. Barron, of Jerseyville, for appellee.

JUSTICE GREEN delivered the opinion of the court:

Plaintiff, John A. Cunningham, a disabled adult acting through his guardian and daughter, Clara R. Heflin, sued defendants, Reba F. Watson (Reba) (plaintiff's sister) and Reba's son, Charles Watson, Jr. (Charles), seeking a court order requiring Reba to reconvey to plaintiff a 77-acre Jersey County farm which plaintiff deeded to Reba on February 11, 1986. Charles Watson was made a defendant because he may have received income from the farm during the time that Reba possessed it. The suit also sought an accounting from Reba and Charles as to all income received from the farm since plaintiff deeded it to Reba. The circuit court ordered reconveyance of the farm on the bases that (1) plaintiff suffered from a " 'real mental weakness' " when he conveyed the property to Reba and (2) defendants did not overcome the resulting presumption that the transaction was not valid. Defendants appeal this order. Plaintiff cross-appeals portions of the same order which require plaintiff to repay $35,000 which Reba paid to plaintiff for conveyance of the farm, require payment to Reba of the interest which she would have earned on that amount during the intervening period, and which deny plaintiff compensation for waste of the farm which allegedly occurred during the time Reba possessed it.

Defendants contend the circuit court order requiring reconveyance of the farm should be reversed because plaintiff did not meet his burden of establishing his mental incapacity at the time of the conveyance. Defendants assert that the circuit court applied the wrong standard in determining whether plaintiff had sufficient mental capacity to deed the farm to Reba and, even if the circuit court utilized the correct standard, the evidence is nevertheless insufficient under that standard to establish lack of mental capacity on the part of plaintiff at the time of the conveyance.

Plaintiff contends that regardless of what standard is used to judge his actions, he lacked sufficient mental capacity to convey the

farm to Reba. He points out that the farm was the only property of significant value which he possessed, and that he rejected his attorney's advice to retain a life estate in it. Plaintiff also observes that several persons who had known him for many years testified that at the relevant times, he lacked the ability to attend to his normal business affairs or to protect his interests. Plaintiff maintains that this is a "fact sensitive" case, in which the decision of the trial court judge, who had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, should be affirmed.

We reverse the circuit court's decision and remand this cause for further proceedings on the basis that the circuit court applied the wrong standard in determining whether plaintiff had sufficient mental capacity to convey the farm to Reba.

The events which culminated in this litigation were precipitated by a December 1984 circuit court order dissolving the marriage of plaintiff and his wife, Doris, who had been married since 1937. As a part of the marital property distribution, the circuit court ordered that the 77-acre farm be sold, so that plaintiff's former wife could be paid for her interest in it. Plaintiff desperately wanted to keep the farm and contacted attorney Lee Plummer to see what could be done to retain possession of it.

The evidence as to the mental capacity of plaintiff during the time period between the dissolution of his marriage and his conveyance of the farm to Reba is in dispute. Plaintiff presented the testimony of seven witnesses, most of whom had known him for at least several years. Most of these witnesses opined that around the time of the February 11, 1986, conveyance of the farm to Reba, plaintiff was incapable of conducting business or protecting his interests. All of these witnesses also described specific instances of eccentric conduct on the part of plaintiff.

Plaintiff's daughter (and guardian), Clara Heflin, who was born in 1938, stated that until the summer of 1984, she and plaintiff had a good relationship. Heflin stated that during that summer, plaintiff "started talking suicidal, *** was saying all sorts of things about suicide" and "was crying all the time."

Raymond H. Myers, who had known plaintiff and been his neighbor for 48 years, stated that in 1982, plaintiff was unable to properly repair a hay baler, although he had been able to do that kind of work before, and that in 1984, plaintiff stated that he got lost while driving from Jerseyville back to his farm. Another neighbor, Douglas Hunt, testified that he had known plaintiff, and plaintiff had been a family friend for most of Hunt's life. Hunt stated that in 1985, plaintiff

planted one of his fields with a planting machine on which one of four planters was not working, thus resulting in 25% of the field not being planted. According to Hunt, plaintiff could not be made to understand why that occurred.

Also testifying on plaintiff's behalf were Iris and Robert Gerber. Robert had been a friend of plaintiff for 25 to 30 years, and Iris became acquainted with plaintiff shortly after her marriage to Robert. She had known plaintiff for about eight or nine years prior to the July 1989 evidentiary hearing in this cause. Both Iris and Robert Gerber testified concerning an incident in February 1986, in which plaintiff went to the Gerbers' home when only Iris and a child were at home, rattled a doorknob, attempted to open a door to the house, and called for Robert Gerber's ex-wife (whose first name is Betty). Also, Robert Gerber testified that in 1986, plaintiff made statements which suggested that he (Robert) may have stolen some property which plaintiff stored on the Gerbers' premises. Robert Gerber further stated that during the same time period, plaintiff went to the Gerbers' home with a box full of old coins, which Robert considered to be collector's items, and despite Robert's advice to the contrary, said he was going to take them to the bank and "cash them in."

Also, four witnesses, including Robert Gerber, stated that during the relevant time period, plaintiff said that Clara Heflin was not his daughter. One of these witnesses, Isabelle Myers, who had been a neighbor of plaintiff and had known him for 50 years, stated that after telling her Heflin was not his daughter, plaintiff said that he wanted Heflin to take a blood test, but that she did not do that.

Testifying on behalf of defendants, attorney Lee Plummer stated that prior to a judicial sale of the farm which plaintiff formerly owned (in the course of plaintiff's dissolution of marriage proceeding), he and plaintiff discussed the possibility of plaintiff buying out his former wife's interest in it. However, plaintiff apparently did not have sufficient funds to do this. On December 14, 1985, the farm, which had been appraised at $99,500 in December 1984, was sold at a judicial auction. The high bidder at this auction was Raymond H. Myers, who bid $66,000. After the sale, Plummer received word from plaintiff that he had reached an agreement with his sister, defendant Reba Watson, under which she would provide the necessary monies to enable plaintiff to purchase the farm. Plummer, acting on plaintiff's request, then contacted Myers to see if he wanted to sell the farm. Myers was unwilling to do so. Therefore, Plummer requested that the circuit court not approve the sale of the farm. At a hearing on this request, the circuit court accepted a bid by plaintiff in the amount of

$70,000, with the provision that Myers could make additional bids. Myers failed to do so, and the farm was sold to plaintiff.

Plummer testified that under the arrangement to which plaintiff and Reba agreed, Reba was to pay plaintiff the $35,000 needed to buy out his ex-wife's interest in the farm. In exchange for this, plaintiff wanted the farm to eventually go to Reba. Plummer stated that he understood that plaintiff and Reba agreed plaintiff could remain on the property and continue to farm it for as long as he wished. Plummer testified that although he suggested plaintiff retain a life estate in the farm, plaintiff did not follow this advice.

According to Plummer, the transaction between plaintiff and Reba involving the 77-acre farm took place on February 11, 1986. Plaintiff exchanged a quitclaim deed to the farm (which stated that the transaction was tax exempt and thus did not bear any tax stamps) for a $35,000 cashier's check. The check was payable to Plummer's escrow account.

Plummer further testified that he talked with plaintiff regarding the preparation of a will after the transaction involving the farm. Plummer stated that although plaintiff was hard of hearing, he believed plaintiff understood the information Plummer conveyed to him and that he (Plummer) was able to understand the information which plaintiff provided to him. Based on his numerous conversations with plaintiff and opportunities to observe him, Plummer felt that plaintiff had sufficient mind and memory to comprehend the nature of his acts when he conveyed his farm to Reba, and that he was capable of exercising his own free will at that time. Plummer stated that, in his relationship with plaintiff, it was not a matter of his telling a client what to do and the client doing it. Rather, plaintiff was absolutely certain as to what he wanted, which was to do whatever was necessary to keep his farm.

Also testifying on defendants' behalf was defendant Charles Watson, Jr., who is the son of defendant Reba Watson and plaintiff's nephew. Charles testified that he saw and conversed with plaintiff several times during the year preceding plaintiff's conveyance of the farm to Reba. Charles stated that during these conversations, he never had any difficulty understanding what plaintiff attempted to convey to him, and (apparently at the time plaintiff deeded the farm to Reba) plaintiff was able to transact business and take care of his own interests.

Charles provided the following description of the terms of the agreement pursuant to which plaintiff conveyed the farm to Reba:

"A. [Charles:] [Reba] was going to provide 35,000 so [plain-

tiff] could buy out his wife's part and then he would deed the property to her. [Plaintiff] could live there as long as he wanted to live there.

\* \* \*

A. \*\*\* I mean, it would be his own farm. Everything would remain the same except the deed was in her [Reba's] name."

Charles indicated that he understood that after plaintiff ceased living on the farm, he and Reba would be entitled to the income from it. He stated that after plaintiff left the farm (plaintiff resided in a nursing home at the time of the trial of this cause), plaintiff did not receive any income from it.

The circuit court found that when plaintiff conveyed the farm to Reba, he suffered from a " 'real mental weakness.' " The circuit court held this fact rendered operative a presumption that the transaction was not valid and shifted to defendants the burden of proving the "perfect fairness" of the transaction and plaintiff's adequate mental capacity when he conveyed the farm to Reba. The court concluded:

"While the defendants presented some evidence as to [plaintiff's] mental capacity and ability to protect his own interest on or about the date in question, the court finds that it was insufficient to overcome the contrary evidence and presumption that he lacked such capacity and ability."

 The circuit court's holding apparently is premised on the following statement in the early case of *Hinkley v. Wynkoop* (1922), 305 Ill. 115, 122, 137 N.E. 154, 158:

"A presumption arises against the validity of the transaction in a case where *real mental weakness* of one of the parties is shown, and the burden of proof in such case rests upon the party claiming the benefit of the conveyance or of the contract to show its perfect fairness and the capacity of the other party." (Emphasis added.)

Later decisions of the supreme court establish that *Hinkley* is no longer an accurate statement of the principles applicable to determining whether a grantor had sufficient mental capacity to execute a deed. First of all, it is generally presumed that the grantor of a deed was of sound mind, and the party seeking to have the deed set aside has the burden of establishing otherwise. A person capable of transacting ordinary business also has sufficient mental capacity to execute a deed. (*Greathouse v. Vosburgh* (1960), 19 Ill. 2d 555, 169 N.E.2d 97.) Decisions subsequent to *Hinkley* generally hold that an individual who (1) is capable of understanding the nature and effect of his acts, and of comprehending his own interests, and (2) is exercising his own will

is capable of executing a valid deed. *E.g., Moneta v. Hoinacki* (1946), 394 Ill. 47, 67 N.E.2d 204; *Redmon v. Borah* (1943), 382 Ill. 610, 48 N.E.2d 355.

Some decisions prior to *Greathouse*, but subsequent to *Hinkley*, suggest that one who is incapable of transacting ordinary business nevertheless may be capable of executing a valid deed. In *Schnoor v. Terlep* (1948), 399 Ill. 101, 77 N.E.2d 140, for instance, the court suggested that even though one may not be mentally capable of entering into a contractual obligation with an adversary, he nevertheless may be capable of disposing of his property by deed or will, if he can comprehend the nature and effect of his acts. Contrary to the *Schnoor* decision, however, the *Moneta* court stated that in order to sustain a deed, it must be established that when the grantor executed the deed, he had the "mental ability to cope with an antagonist and to understand and protect his own interests." *Moneta*, 394 Ill. at 58, 67 N.E.2d at 210.

As long as the evidence is otherwise sufficient to establish that the grantor possessed mental capacity to execute a deed, eccentric actions on his part generally are not a sufficient basis for setting aside the deed. (*Redmon*, 382 Ill. 610, 48 N.E.2d 355.) Also, unreasonable caprice or prejudice in executing a deed is of no relevance to its validity, unless the deed's execution is explainable on no grounds other than insane delusion or undue influence. *McGlaughlin v. Pickerel* (1943), 381 Ill. 574, 46 N.E.2d 368; *Kimball v. Cuddy* (1886), 117 Ill. 213, 7 N.E. 589.

The evidence here presented a question of fact as to whether the conveyance from plaintiff to Reba should be set aside. The evidence supported the decision of the circuit court in that respect, but Reba was entitled to have the trier of fact apply the proper rules of law. As we have indicated, the circuit court's reliance upon the *Hinkley* decision was incorrect and requires granting defendants a new hearing. On remand, the predominant factors which the court should consider in determining whether plaintiff had sufficient mental capacity to deed the farm to Reba are whether he understood the nature and effect of his action in executing the deed, whether he was able to comprehend his own interests at that time, and whether he exercised his own free will in executing the deed. Since the transaction between plaintiff and Reba Watson was not a wholly gratuitous conveyance and had at least some characteristics of a business transaction, the circuit court should also consider whether plaintiff was capable of transacting ordinary business and protecting his own interests while dealing with an antagonistic party when he executed the deed.

■ The validity of the deed by which plaintiff conveyed the farm to Reba Watson is to be reconsidered under standards different from those which the circuit court utilized and somewhat different from those which counsel assumed were applicable in the prior circuit court proceedings in this cause. Therefore, on remand, the circuit court should afford the parties an opportunity to present additional evidence if they so desire. See *Lamb v. Lamb* (1984), 124 Ill. App. 3d 687, 464 N.E.2d 873.

Because we reverse the circuit court's order, we need not consider defendants' alternative contention that the circuit court abused its discretion in allowing plaintiff to reopen his case in chief. Nor need we now consider plaintiff's contentions on cross-appeal that (1) the circuit court erred in ordering plaintiff to repay to Reba the $35,000 which she paid for the farm, plus interest, and (2) plaintiff is entitled to compensation for waste which occurred during the time that Reba possessed the farm.

The circuit court order which requires defendant Reba Watson to reconvey to plaintiff the 77-acre farm which he formerly owned is reversed, and this cause is remanded to the circuit court for further proceedings consistent with this opinion.

Reversed and remanded.

LUND, P.J., and SPITZ, J., concur.