WILMA HOFFERKAMP, as Ex'r of the Estate of Elmer Roesch, Deceased, Plaintiff-Appellant, v. ESTA C. BREHM *et al.*, Defendants-Appellees.

Fourth District   No. 4—93—0716

Argued May 18, 1994.—Opinion filed July 14, 1995.—Rehearing denied August 15, 1995.

Patrick V. Reilly (argued) and Irene H. Gainer, both of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellant.

William C. Evers III (argued), of Collinsville, for appellee Judy Koke Balsters.

Steven C. Ward (argued), of Heckenkamp, Simhauser & LaBarre, P.C., of Springfield, for appellee Esta C. Brehm.

JUSTICE COOK delivered the opinion of the court:

Plaintiff Wilma Hofferkamp is the executor of the estate of Elmer Roesch, who died May 19, 1991. Elmer was plaintiff's brother. By deed recorded April 18, 1991, a residence in Leland Grove, Illinois, was conveyed to Elmer and defendant Esta C. Brehm, as joint tenants. Plaintiff filed this chancery action on February 3, 1992, asserting that Elmer lacked the donative intent (or was incompetent) to make a gift of the residence and that Esta was guilty of undue influence. Because the court was exercising its equity jurisdiction, it convened an advisory jury, which found for plaintiff on both questions.

The court refused to be bound by those verdicts and instead found that (1) Elmer had formed a donative intent to make a gift when he signed the contract to purchase, which resulted in a conditional gift which was never revoked; (2) Elmer was competent at all pertinent times; (3) there was no fiduciary relationship, either as a matter of law or by the repose of trust and confidence, and in any event there was no breach of any fiduciary relationship; (4) Esta had not exercised any undue influence; (5) plaintiff was guilty of *laches* because she did not file her action in the 23 days before Elmer died, although a power of attorney naming her had then been activated; and (6) both plaintiff and Elmer had ratified the conveyance. The court did not address the concept of resulting trust, although that issue had been raised by the pleadings. Plaintiff appeals. We reverse and remand.

Elmer and Esta began dating in 1988, following the death of Elmer's wife. They became engaged in December 1990, when each was 84 years old. The wedding was planned for April 20, 1991. On March 5, 1991, they signed a contract to purchase the home in Leland Grove for $125,000. The contract was prepared by Joe Grimes, a realtor representing the seller. The contract did not state how title would be taken, but Grimes testified he explained the various forms of holding title and Elmer told him he wanted title to be in joint tenancy with Esta with a right of survivorship. Earnest money of $1,000 was deposited when the contract was signed. The contract provided for title insurance, with buyer or his attorney to have a reasonable time after receipt of such title evidence to specify objections. Closing was set for April 10.

On April 6, 1991, Elmer suffered a heart attack and was admitted to the intensive care unit at St. John's Hospital. On April 10 he was transferred from intensive care to a room in cardiac rehabilitation.

Patrick J. Sheehan testified that he was a lawyer and had represented Elmer for many years. On April 9, Esta called him to say that Elmer was in the hospital, and their real estate closing was set for April 10. Esta testified she called Sheehan on April 9 because he was Elmer's attorney, and Elmer asked her to contact him. Sheehan testified he suggested delaying the closing and Esta asked him to contact Doug Brown, the seller's attorney. Brown agreed to delay the closing to the 12th. Sheehan picked up the closing papers at Brown's office and went to Elmer's hospital room on the 11th. Because of Elmer's condition, Sheehan did not go into any detail, but told Elmer the closing could be done without him by activating a power of attorney Elmer had executed in 1988. Elmer told Sheehan he wanted to be present at the closing and asked that Sheehan get the closing delayed further. Sheehan understood that Elmer wanted Sheehan to

represent him in connection with the purchase. Sheehan did not look at the proposed deed until he returned to his office. Sheehan called Brown, but Brown was reluctant to further delay the closing. According to Sheehan, Esta called on the 16th and said the seller was willing to extend the closing but the realtor was pushing to get it closed. Esta denied that statement.

Sheehan testified Esta called him on the 18th and asked if the papers were all right, and Sheehan said he had not looked at them. Esta said that they were ready to close, but Sheehan said that he had to talk to Elmer, and he was going up to the hospital to talk to him. Esta said that was not a good idea because Elmer was not doing well that day. Sheehan did talk to Elmer, around noon, and explained to him various ways of taking title, including giving Esta a life estate after Elmer's death. Elmer said he wanted to think about it overnight. As Sheehan was leaving, Esta came in, and as Sheehan began to explain the life estate idea, Esta said the deal was already closed, and they had taken title "the way the contract said, in both names." Elmer said nothing, but looked at Sheehan with a look of distress on his face. Sheehan was dumbfounded that the closing had taken place without his knowledge. Sheehan's present belief was that Elmer did not understand what Sheehan was saying on the 18th. It was apparent that Elmer was either confused or did not know that a closing was taking place. Sheehan went to Elmer's room on the 19th, but Esta was there, so Sheehan told Elmer he would be back to talk with him later. Sheehan returned on the 22nd and spoke to Elmer alone. Elmer was weaker than he had been on the 19th. Sheehan tried to explain to Elmer what had happened, but Elmer was sick and gave Sheehan the impression he really did not want to hear anything further about it. Sheehan explained that joint tenancy meant that on the death of either party the other joint tenant, here Esta, would be the sole owner of the property. Sheehan said "is that okay?" and Elmer responded "yes." Sheehan visited Elmer two more times, but both times Elmer was noncommunicative.

Sheehan testified he had prepared a general power of attorney for Elmer, dated May 4, 1988, in which Elmer appointed plaintiff his attorney-in-fact. The power of attorney would be activated when the attorney-in-fact received a written opinion from a physician familiar with Elmer's condition that Elmer was incapable of conducting his business affairs. Sheehan obtained such an opinion from Elmer's treating physician, Dr. Glen Wichterman, and sent a letter to Esta, dated April 26, advising her of that fact.

Dr. Robert Woodruff testified that he made the following hospital notes on April 14, shortly after 4 p.m.: "Will discuss code status

[with] family[,]" and later, "[Patient's] fiancée comfortable [with] full code status. Will continue aggressive medical therapy. Prognosis grim." Dr. Woodruff testified that "code status" indicated how the hospital staff would respond if something happened to the patient, whether the staff would intervene or just let that patient pass away without intervention. Dr. Woodruff could not remember the person he had spoken to or whether he had spoken to her in person, but he did make the note. Esta testified that she remembered no discussions with Dr. Woodruff at any time or discussions of code status that day. Esta did remember speaking to Dr. Benning sometime after Elmer had been taken out of intensive care about the staff doing everything they could to keep Elmer alive if the time came that he needed extra help. Esta told Dr. Benning "Yes, do everything you can." Dr. Woodruff testified that "prognosis grim" meant that the patient was not doing well and that he probably would not be alive much longer. In Dr. Woodruff's opinion Elmer was clearly unable to give informed consent to medical procedures. Dr. Woodruff also believed that Elmer was not capable of making real estate decisions.

Esta testified that on April 14 she went to Elmer's house and got a key to Elmer's lockbox and his checkbook. She prepared a note to the bank giving herself access to Elmer's lockbox, and Elmer signed it. On April 15, Esta went to the bank, entered the lockbox, and removed Elmer's $100,000 certificate of deposit. Elmer endorsed the certificate, and Esta deposited the proceeds in Elmer's checking account on April 16. On April 16 or 17, Esta called the realtor, told him Elmer was feeling better and that he wanted to close the deal. On April 18, shortly before 11 a.m., Esta obtained Elmer's signature on a blank check. She and the realtor then went to the bank, filled in the amount of $121,669.27 on the check, and purchased a cashier's check with it. Esta testified this was all done at Elmer's direction. The realtor told her what to fill out. Esta told no one other than the realtor about any of this. She talked to Sheehan just before the closing, but did not tell him about it, because Elmer did not ask her to. After obtaining the cashier's check, Esta and the realtor went to attorney Brown's office, where they exchanged the check for the deed. The realtor testified the figures had been agreed to previously, but did not say by whom. Esta and the realtor then went to the recorder's office and recorded the deed. She then went back to Elmer's room and was there when Sheehan arrived, contrary to Sheehan's testimony. When Sheehan came in, he went over to Elmer and asked about a date for the closing, and Elmer told him it was done. Esta stated Sheehan was very surprised. On July 8, Esta quitclaimed the property to herself and her daughter, defendant Judy Koke Balsters, as joint tenants.

Esta testified she did not intend to give her daughter any present interest in the property by that deed.

Esta testified she normally was in Elmer's hospital room in the afternoon and evening, while plaintiff was there during the morning and noon hour. The nurse's notes on April 14 at 1440 show patient appears to be getting lethargic, continues to lie in bed and moan, unwilling/unable to follow commands. Esta testified she was in the room at that time, but to her knowledge those characterizations were not accurate. The nurse's notes at 1500 show patient remains lethargic, does not follow commands. Esta could not remember if that was accurate or not. The nurse's notes at 1600 show patient responds to name only, will not follow commands, moans and groans, restless in bed. Esta agreed that was his condition. The nurse's notes at 2000 show patient remains in wrist restraints. Esta did not remember the wrist restraints. Esta kept a diary, and she wrote for the 14th, "bad day."

The nurse's notes on April 15 at 1430 show patient very lethargic and confused. Esta testified that did not totally square with her recollection. The nurse's notes at 1500 show patient more alert today, able to follow commands, but still confused, weak, moans a lot. Esta disagreed, stating Elmer never did moan a lot when she was with him. The nurse's notes at 1935 show patient remains confused at times, side rails up times four plus bed alarm on. Esta did not remember Elmer acting like that.

The nurse's notes on April 16 at 1200 show patient a little better today although conversation not always appropriate. Esta was not at the hospital at that time. A later entry shows patient worse this afternoon. That did not square with Esta's recollection. The nurse's notes at 1630 show patient alert to name, moaning at times, confused to place and time, all four side rails up. Esta did not remember whether that was in fact his condition at that time.

The nurse's notes for April 18 at 0910 show patient continues to be confused at times, reorients easily. Esta agreed with that assessment. The nurse's notes for 1000 show patient very weak. Esta agreed that when Elmer signed the blank check that morning he was very weak. The nurse's notes at 1200 show patient very weak, does not want to walk today. Esta again agreed he was weak. Eleven of the twelve health care providers who observed Elmer during his hospitalization testified that he was incompetent at pertinent times, although most of them acknowledged there were times when he was alert and oriented.

Kenneth Dunlap testified that he was 91 years old and a friend of Elmer and Esta. He testified he visited Elmer in the hospital, and

Elmer told him that he had closed on the house, that Esta could move in as soon as they got the carpet down, and when he got out of the hospital she could take care of him. Dunlap testified Elmer said that if something happened to him Esta would have a place to live, and he wanted her to have the house. Dunlap testified that Esta was in the room pretty near every time he visited Elmer, and he had spoken to Esta several times outside the hospital. It appears that Dunlap has difficulty distinguishing between what Elmer told him and what Esta told him, either in Elmer's presence or on other occasions. For example, Dunlap testified Elmer told him that after Esta had moved into the new house Elmer told her to get some things for him from the old house, but when she tried to do so the locks had been changed. Further questioning indicated that Esta had told Dunlap that. Dunlap's testimony is inherently implausible and of little or no probative value.

In equity cases, a jury sits in an advisory capacity, and its verdict and findings may be wholly disregarded by the court. (See *Riehl v. Riehl* (1910), 247 Ill. 475, 477, 93 N.E. 318, 319; *Sidwell v. Sidwell* (1975), 28 Ill. App. 3d 580, 585, 328 N.E.2d 595, 599.) Findings made by the court in a case where the testimony is conflicting will not be disturbed unless they are against the manifest weight of the evidence. A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence. *Bazydlo v. Volant* (1995), 164 Ill. 2d 207, 215, 647 N.E.2d 273, 277.

■ There is overwhelming evidence in this case that Esta was guilty of actual fraud. Esta intentionally kept information from Elmer's attorney that a closing had been set and went through the closing without the attorney being present. Fraud encompasses any act, omission, or concealment calculated to deceive, including silence, if accompanied by deceptive conduct or suppression of material facts constituting an act of concealment. (*Farm Credit Bank v. Isringhausen* (1991), 210 Ill. App. 3d 724, 727, 569 N.E.2d 235, 237; *In re Segall* (1987), 117 Ill. 2d 1, 7-8, 509 N.E.2d 988, 991 (fraud where attorney litigant bypassed opposing party's attorneys).) Defendants argue that Sheehan was employed only to delay the closing and not to represent Elmer. Esta testified she did not ask Sheehan to help Elmer, she asked him for advice only, on Elmer's behalf. Sheehan spoke directly to Elmer on the 11th, however, and Sheehan testified that Elmer had employed him generally in connection with the sale of the real estate. The idea of a limited employment is inconsistent with Esta's question to Sheehan on the 18th whether the papers were all right. Sheehan had the papers, and Esta expected him to ex-

amine them. Esta chose to proceed to closing without that examination. Esta testified that Elmer did not tell her to tell Sheehan about the closing. Elmer did not tell her, however, *not* to tell Sheehan about the closing, or to discharge Sheehan.

■ Although the trial court found that Elmer was competent to make a gift during the time he was hospitalized and through the date of the closing, and on the 22nd, the trial court backed up that finding with a finding that Elmer had made a "conditional gift" when he signed the contract to purchase, and that conditional gift had not been revoked. The idea seems to be that where one has taken steps to make a gift, but is interrupted before the gift is completed, the gift should be carried out in the absence of a showing that the donor had some contrary intent. The law is to the contrary.

There is no gift until there is an absolute and irrevocable delivery of the property to the donee. (*Moniuszko v. Moniuszko* (1992), 238 Ill. App. 3d 523, 529, 606 N.E.2d 468, 472; *Hall v. Eaton* (1994), 258 Ill. App. 3d 893, 895, 631 N.E.2d 833, 836.) A promise to make a gift in the future is not a gift, is generally unenforceable, and is revocable at any time until the gift is executed. (*Hux v. Woodcock* (1985), 130 Ill. App. 3d 721, 724, 474 N.E.2d 958, 961; *Meyer v. Meyer* (1942), 379 Ill. 97, 104, 39 N.E.2d 311, 314.) Where an individual forms an intent to make a gift, and takes steps to make that gift, but dies before the gift is completed, there is no gift. (*Pocius v. Fleck* (1958), 13 Ill. 2d 420, 428, 150 N.E.2d 106, 111 (death revokes the part which has been performed); see also *Barasch v. Barasch* (1993), 259 Ill. App. 3d 958, 962-63, 628 N.E.2d 833, 835-36.) The trial court recognized the *Pocius* rule, but felt it did not apply, saying "[t]he illness of Elmer Roesch did not operate as an automatic revocation of the gift as with death." Death does not revoke a gift, it prevents the gift from being completed. We see no difference between death and incompetency for this purpose, at least where the incompetency continues until death.

■ Defendants argue that Elmer was bound to go through with the contract after he had signed it. It seems unlikely, however, that a court would order specific performance against someone in Elmer's situation; the sellers would only have been entitled to their lost profits in the event of a breach by Elmer. As the seller's realtor testified that the property in fact was worth $125,000, it would appear that damages would be minimal. The contract gave the seller the option to retain the earnest money as liquidated damages, but that was only $1,000. Even if Elmer could have been forced to go through with the contract, it does not appear that he could have been forced to take title with Esta in joint tenancy. The contract does not indicate how title was to be taken, and although the buyers are described as

Elmer and Esta, there is nothing in the contract which would require that Elmer accept an interest less than the portion of the purchase price he paid.

■ Because Esta was guilty of actual fraud, we need not consider whether there was a fiduciary relationship in this case. We address that issue, however, for the sake of completeness. Defendants argue there is no *per se* fiduciary relationship between engaged parties. It is clear, however, that the relationship of principal and agent gives rise to a fiduciary relationship, as a matter of law. (*Ray v. Winter* (1977), 67 Ill. 2d 296, 304-05, 367 N.E.2d 678, 682-83; *Eldridge v. Eldridge* (1993), 246 Ill. App. 3d 883, 889, 617 N.E.2d 57, 62-63.) By her own testimony, Esta was acting as Elmer's agent ("I was merely doing the legwork for Elmer"). On a separate ground, defendants argue that Elmer did not repose special trust and confidence in Esta—but where one individual gives another a signed blank check and the key to his safe deposit box, it seems clear that special trust and confidence have been reposed. There was a fiduciary relationship here, and once such a relationship is established, the law presumes that any transaction between the parties in which the dominant party has profited is fraudulent, a presumption which may be rebutted only by clear and convincing proof. *Hofert v. Latorri* (1961), 22 Ill. 2d 126, 130, 174 N.E.2d 866, 868.

■ Along similar lines, a purchase money resulting trust arises where one person purchases property with his own funds and title is taken in the name of another. The mere payment of the consideration raises a *prima facie* presumption of a resulting trust. (*In re Estate of Wilson* (1980), 81 Ill. 2d 349, 355-56, 410 N.E.2d 23, 27.) Where a husband purchases property and title is taken in his and his wife's names, as joint tenants, there is a presumption of gift and not a presumption of resulting trust. (*Wilson*, 81 Ill. 2d at 356, 410 N.E.2d at 27.) There is no such presumption of gift, however, where the parties are only engaged and not actually married. (See *Prassa v. Corcoran* (1962), 24 Ill. 2d 288, 293-94, 181 N.E.2d 138, 142.) It is the general rule that if a gift is made after the parties become engaged, the gift is in contemplation of their marriage and is assumed to be conditioned upon the marriage's taking place. 1 H. Clark, The Law of Domestic Relations in the United States, § 1.6, at 32 (2d ed. 1987); *Vann v. Vehrs* (1994), 260 Ill. App. 3d 648, 653, 633 N.E.2d 102, 106 (engagement ring).

■ The trial court found that plaintiff was Elmer's attorney-in-fact after April 26, and could have taken various legal actions after she learned of the closing, and her failure to do so constituted *laches*. According to the trial court, plaintiff's decision not to "upset" Elmer,

and to wait until after his death to assert her claims, prejudiced defendants, who were then unable to obtain an independent medical examination or take Elmer's deposition. *Laches* is such a neglect or omission to assert a right, taken in conjunction with a lapse of time of more or less duration, and other circumstances causing prejudice to an adverse party, as will operate to bar relief in equity. (*Meyers v. Kissner* (1992), 149 Ill. 2d 1, 12, 594 N.E.2d 336, 340.) Actions concerning title to real estate will generally not be barred in equity until the statute of limitations has expired. (*Meyers*, 149 Ill. 2d at 12, 594 N.E.2d at 340-41.) Plaintiff should at least be allowed a reasonable time to file her action, and 23 days was not a reasonable time.

Defendants' argument as to prejudice is unconvincing. Plaintiff's power of attorney was activated when Dr. Wichterman signed an affidavit that Elmer was incapable of conducting his business affairs. After that time it was too late to take Elmer's deposition. Elmer was undergoing continuous medical examination while he was in the hospital, and defendants have not shown that all health care personnel were biased in favor of plaintiff. Perhaps plaintiff could have taken steps to sever the joint tenancy while Elmer was alive, but that would not have provided a complete remedy. When plaintiff filed this action almost nine months after Elmer had died, it is true some liability had accrued on Esta's part for rent, but it does not appear she was prejudiced thereby, as she received a benefit equal to the accrued liability.

■ The trial court found that Elmer, and plaintiff on Elmer's behalf, ratified the conveyance after the closing by their "subsequent conduct," citing *Roe v. Roe* (1963), 28 Ill. 2d 232, 238-39, 190 N.E.2d 771, 774. In *Roe,* plaintiff waited 10 years to challenge a deed to his wife, after allowing the wife to use the farm income to support his children during that time, and to commit herself to a mortgage of $16,000. A victim of fraud who accepts the benefits flowing from the contract for any considerable length of time ratifies the contract. (*Carlile v. Snap-on Tools* (1995), 271 Ill. App. 3d 833, 842, 648 N.E.2d 317, 324; see also *Eisenberg v. Goldstein* (1963), 29 Ill. 2d 617, 622, 195 N.E.2d 184, 186-87 (waiver of fraud by accepting benefits of contract).) The present case, however, does not involve any "conduct," any unfair retention of benefits on the part of Elmer or plaintiff. A defrauded party, especially one who is weak and ill, does not ratify the fraud by saying "okay." Ratification of an act can be effected only when it appears that the party to be charged with ratification clearly evinces an intent to abide and be bound by the act, with full knowledge of it. (*Peskin v. Deutsch* (1985), 134 Ill. App. 3d 48, 55, 479 N.E.2d 1034, 1039.) Waiver is the purposeful relinquishment of a known

right, and to establish an implied waiver there must be a clear, unequivocal, and decisive act of a party showing such a purpose. (*Jones v. Melrose Park National Bank* (1992), 228 Ill. App. 3d 249, 256, 592 N.E.2d 562, 567.) There was no such act in this case, either on the part of Elmer, or on the part of plaintiff.

■ It is generally presumed that the grantor of a deed was of sound mind, and the party seeking to have the deed set aside has the burden of establishing otherwise. (*In re Estate of Cunningham* (1990), 207 Ill. App. 3d 72, 77, 565 N.E.2d 301, 304-05.) In this case, of course, Elmer was not the grantor, and we do not have the evidentiary protection of his signing a deed before independent witnesses. No cases have been cited to us indicating that the *grantee* of a deed is generally presumed competent. The rules which apply to gifts, not deeds, control here. The alleged donee of a gift carries the burden of proving the existence of donative intent in the donor, and proof must be clear and convincing in order to establish the gift. *Moniuszko*, 238 Ill. App. 3d at 529, 606 N.E.2d at 472-73.

Defendants argue that the opinions of the hospital staff that Elmer was incompetent do not negate the possibility that Elmer was competent when he signed the note authorizing Esta to enter the lockbox, and when he signed the blank check, as Esta was the only person present at those times. Esta did not testify to Elmer's capacity at those particular times, although she did testify that every step she took was at Elmer's direction. Even if Esta had gone into detail, the testimony of a donee as to what was said to him by a deceased donor should be carefully scrutinized. (*In re Estate of Kaminski* (1990), 200 Ill. App. 3d 309, 312, 558 N.E.2d 142, 145.) It is not sufficient, to show capacity, that the donor responds to his name or recognizes visitors. Rather, it must be established that the donor had the " 'mental ability to cope with an antagonist and to understand and protect his own interests.' " (*Cunningham*, 207 Ill. App. 3d at 78, 565 N.E.2d at 305, quoting *Moneta v. Hoinacki* (1946), 394 Ill. 47, 58, 67 N.E.2d 204, 210.) Competency is a question of fact, for the trier of fact, but again the testimony in this case is overwhelming that Elmer did not have the capacity to make a gift at any pertinent time.

■ Because Esta was guilty of fraud in this transaction, a transaction in which she profited, she holds the Leland Grove residence on constructive trust, in favor of Elmer's estate. On remand the trial court should order her to convey the property accordingly. The same is true of defendant Judy Koke Balsters. On remand the court may consider the amount of damages due plaintiff because of Esta's oc-

cupancy of the premises during the pendency of this suit, and any other damages claimed by plaintiff.

Reversed and remanded.

LUND and STEIGMANN, JJ., concur.