NO. 4-96-0649

                          IN THE APPELLATE COURT

                                OF ILLINOIS

                              FOURTH DISTRICT

In the Matter of the Estate of          )    Appeal from

ROSE S. DEJARNETTE, Deceased,           )    Circuit Court of

DOROTHY MEIS, CATHERINE BURNS, FRANK    )    Logan County

DEJARNETTE, SHIRLEY GALLOWAY, WILLIAM   )    No. 93P96

STOLL, JOHN THOMAS STOLL, MERRITT STOLL,)

WILLIAM HUFF, JUDY GORDON, and NORMAN   )    

HUFF,                                   )    

          Petitioners-Appellants,       )    

          and                           )

DONALD A. BEHLE, Special Administrator  )

of the Estate of Rose S. DeJarnette,    )

Deceased,                               )

          Petitioner,                   )

          v.                            )    Honorable

VERA LECOURIS,                          )    Gerald G. Dehner,

          Respondent-Appellee.          )    Judge Presiding.

_________________________________________________________________

          JUSTICE COOK delivered the opinion of the court:

          Rose DeJarnette gave her power of attorney to her

cousin, Vera Lecouris.  Thereafter, Vera arranged for Rose's

funds to be placed in joint tenancy accounts with Vera and for

Vera to be named beneficiary of a life insurance policy and a

pension fund.  In this citation proceeding, the trial court

ordered Vera to reimburse Rose's estate for various amounts Vera

claimed were inter vivos gifts but allowed Vera to keep the joint

accounts and other assets.  Rose's legatees appeal.  We reverse

and remand in part and dismiss the appeal in part.  

                                  I     

          Rose was born in 1907 and died June 19, 1993.  From

1977 until the time of her death, she resided at Walnut Ridge

Nursing Home (Walnut Ridge).  In 1979, Rose gave her cousin,

Hester Huff, power of attorney over her affairs.  When Hester's

health began to fail, in 1988, Rose executed another power of

attorney, in which Vera was also named.  Vera became sole attor-

ney-in-fact upon Hester's death in August 1990.

          Rose did some estate planning after her husband's death

in November 1971.  In late 1971, she executed a form making

Hester the beneficiary of her life insurance policy with Equita-

ble Life Insurance.  In 1972, she made Hester the designated

recipient of the death benefit of her pension with Teachers'

Retirement System (TRS).  In Rose's 1972 last will and testament,

she devised Hester her grandmother's watch, a life estate in one-

half of her real property (the remainder to go to Hester's

"bodily lineal descendants") and one-quarter of her residuary

estate.  Lyle Stoll, another cousin of Rose's, was devised a life

estate in the other one-half of the real property (the remainder

to Hester's bodily lineal descendants) and also was to receive

one-quarter of the residuary estate.  The remaining one-half of

the residue was to be split equally among 28 named persons, Vera

among them.

          Rose did not change her estate plan after Lyle died in

1986.  After Hester's death, Rose's savings account and checking

account at the State Bank of Lincoln (Lincoln) were changed in

September 1990 to joint tenancy with Vera.  Rose's signature

appears on signature cards authorizing these changes.  Vera

testified she filled out the cards and brought them to Rose at

Walnut Ridge, Rose signed them, and Vera returned them to the

bank.

          Rose also signed a Bank of Chestnut (Chestnut) signa-

ture card in September 1990, which Vera had obtained, filled out,

brought to Rose for her signature, and returned to the bank. 

That document, which states on its face that it "goes with your

time certificate of deposit [(CD)][N]o. 1554," directs that the

account be made joint between Rose and Vera.  However, Rose did

not have a CD No. 1554 at Chestnut.  William Glaze, a loan

officer at Chestnut, testified that 1554 was Rose's customer

number, and the document had the effect of changing all of Rose's

CDs at the Chestnut to joint tenancy with Vera.

          In October 1990, joint checking account No. 121-045 was

opened at Chestnut.  Rose's and Vera's signatures appear on the

signature card.  Again, Vera testified she filled out the card,

brought it to Rose at Walnut Ridge for her signature, and took it

to the bank.  That account was funded with $12,555.03 Vera ob-

tained by using the power of attorney to cash some United States

Treasury E bonds (E bonds) held in Rose's name alone.  Vera

testified she did that because Hester had allowed Rose's Medicare

supplemental insurance to lapse, and Vera felt it was important

to have cash on hand in the event of an emergency.  On October 9,

the day after the account was opened, Vera wrote herself a check

on the account in the amount of $2,555.03, with the notation,

"1989 Business."  On the same date, she wrote herself a check for

$2,500 from the Lincoln joint checking account, with the nota-

tion, "1990 Business Gift."  Vera testified these two transfers

were at Rose's direction.  They were part of the funds the trial

court ordered Vera to reimburse the estate.

          In October 1990, TRS wrote Vera indicating it could not

accept a form she had sent in nominating herself as beneficiary

of Rose's TRS pension.  In November, Rose signed a form, filled

out by Vera, making Vera the beneficiary of Rose's TRS pension. 

In December 1990, Rose signed a form, which Vera had filled out,

making Vera the beneficiary of Rose's life insurance.       

          On August 15, 1991, Norman Huff, Hester's son and one

of the petitioners, went with Vera to visit Rose.  He spent

between 2 and 2½ hours with her.  He testified that Rose recog-

nized him, knew who he was, and seemed clearheaded and able to

communicate effectively.  Norman wrote a letter in March 1994 to

Steven Miller (counsel for Vera) regarding the visit, and that

letter was introduced into evidence.  The letter contained the

following paragraph:

               "I told Rose that we had found Mother's

          [(Hester's)] copy of Rose's will in the file

          cabinet and when I read it I noticed that

          Vera may have been left out.  I wasn't sure! 

          She informed me very abruptly that if there

          was anything left when she passed away,

          Hester's kids would get her farm land, and

          her joint accounts would go to Vera, so I did

          not mention it again!"

Norman repudiated this paragraph when he testified.  He reaf-

firmed that Rose seemed competent but maintained this particular

section was not true, that there had in fact been no conversation

regarding Rose's will or joint accounts.  He said the paragraph

was not in his first draft of the letter, but when he showed the

letter to Vera (before he sent it to Miller) Vera said it would

not be much help.  Rose told him that Miller had hoped there

would be some mention of joint accounts.  Norman told Vera he

could rewrite it, and he did.  He said he did so because he did

not think there could be very much money involved, and he hoped

the letter would end the litigation, which he saw as a waste of

time.  Vera testified that she did not tell Norman to mention

joint accounts when he showed her the first draft of the letter,

that she merely asked him to "'[b]e specific.'"  She did admit he

showed her the letter and redrafted it at her home before he sent

it to Miller.

          Vera testified that on January 24, 1992, she and Rose

had a conversation in which Rose asked if Vera had been in

Hester's will.  When Vera said she had not been, Rose said she

could "'take care of that.  Would you, whatever it takes, I want

to change the [CDs] into your name, both at Chestnut and at

[Lincoln].'"  On January 28, Rose signed the following document:

          "I Rose W. DeJarnette direct [Chestnut] to

          add Vera R. Lecouris on my [CDs] whose num-

          bers are 23969, 23241, 25062, and 25063. 

          This same directive is to be followed in the

          event of purchase of additional [CDs] in my

          name or to changes in any of the [aforemen-

          tioned] [CD] amounts which would make it

          necessary to rewrite the [CD]."  

Rose's signature on the document was notarized.  Glaze testified

the document had no effect as far as Chestnut was concerned,

since all the CDs there were already in joint tenancy because of

the card Rose had signed in September 1990.  By the end of

January 1992, Vera had changed all the certificates for the CDs,

at both banks, so that on their faces they showed both Vera and

Rose as owners.

          In February 1992, Vera opened a joint mutual fund

account with Prudential Mutual Fund Services (Prudential).  Rose

did not sign the application; Vera signed it for her using the

power of attorney.  Vera opened the account with $30,000, $10,000

of which came from one of the Lincoln CDs, $8,000 from the

account opened with the proceeds from the E bonds, and $12,000

from the Lincoln savings account.  To this initial deposit were

added $20,000 in June 1992, $10,000 in July 1992, and $32,436.26

in August 1992.  Forty thousand dollars came from the remaining

CDs at Lincoln, and the other $22,436.26 came from CDs at Chest-

nut.  Vera testified she signed each of the CDs.  Only four of

those signatures (on four Lincoln CDs) are in the record.  Two of

them Vera signed "Vera Lecouris P.O.A.," while on the other two

Vera signed Rose's name and then signed "Vera R. Lecouris P.O.A."

beneath.  In September 1992, another Chestnut CD came due, which

Vera testified she endorsed and deposited into her personal

account according to Rose's direction.

          There was some testimony regarding Rose's mental

condition during the times these transfers were made.  The only

doctor who testified, Dr. Daniel O'Brien, was unable to state an

opinion as to Rose's competence.  He read quite extensively from

the notes of Rose's previous physician, a Dr. Newell, but the

trial court sustained a hearsay objection to the notes, only

allowing them in to explain Dr. O'Brien's expert opinion (of

which there was none).  Wilson v. Clark, 84 Ill. 2d 186, 417

N.E.2d 1322 (1981); see Kelly v. HCI Heinz Construction Co., 282

Ill. App. 3d 36, 42, 668 N.E.2d 596, 600 (1996) (trial court has

discretion to refuse admission of medical records, offered as

business records, despite 1992 amendment to Supreme Court Rule

236 (145 Ill. 2d R. 236)).  Vera's hearsay objection to another

document, in which Dr. Newell had stated that Rose was unable to

comprehend the rights and responsibilities of a nursing home

resident, was also sustained.  Doris Wilson, Rose's nurse during

the relevant period, testified Rose was able to function so long

as she was able to follow her routine, but she would go into a

"tizzy" if the routine were not followed.  Wilson testified Rose

was very suggestible, that she "didn't have the mentality of an

adult," and "[i]f Rose was used to seeing you you could tell her

what to do."

                                    II

          The trial court first noted that an attorney-in-fact is

charged with a fiduciary obligation to act in his principal's

best interests, and that an attorney-in-fact has no authority to

make donations or engage in self-dealing.  The trial court

accordingly voided the lifetime transfers totalling $13,173.19. 

On the post-trial motion, the court ruled that the lifetime

transfers were violative of Vera's fiduciary responsibility--

"they were an example of poor judgment on her part but not to the

extent the transfers amounted to fraud."  

          The trial court referred to "the balancing test as sug-

gested in Murgic [v. Granite City Trust & Savings Bank, 31 Ill.

2d 587, 202 N.E.2d 470 (1964)] where conflicting presumptions are

involved."  The conflicting "presumptions" in Murgic were that

(1) one claiming a gift must prove donative intent by clear and

convincing evidence, but (2) creation of a joint tenancy account

gives rise to a presumption of donative intent.  Murgic held the

presumption of donative intent controlled, the person claiming

against the surviving joint tenant had the burden of disproving

intent, and to void the presumption of donative intent the proof

was required to be clear and convincing.  Murgic, 31 Ill. 2d at

590-91, 202 N.E.2d at 472.  The trial court found there was no

clear and convincing evidence of undue influence or that Rose was

incompetent.  It seems clear the trial court saw this case as

resolved by Murgic and determined that the controlling presump-

tion of donative intent arising from the creation of the joint

tenancies had not been refuted by clear and convincing evidence. 

          The trial court did discuss the presumption of fraud,

stating that Vera's inexperience and poor judgment had not "been

clearly and convincingly shown to amount to fraud."  That analy-

sis is backwards but, in its ruling on the post-trial motion, the

court revised its statement to say that "there is sufficient

evidence to rebut any presumption of fraud."  Apparently, that

evidence is the court's finding that Vera had Rose's welfare in

mind above all others and that Rose's plan was to take care of

those who took care of her.  The trial court stated that it had

ample opportunity to observe the witnesses, particularly Vera.  

                                    III

          There is a presumption of donative intent where the

proof shows that the making of a deposit and the execution of the

joint tenancy account contract is in conformity with the statute. 

Murgic, 31 Ill. 2d at 590, 202 N.E.2d at 472.  "'Public policy

would seem to require the adoption by the courts of a more

liberal and practical view of these common transactions.'" 

Murgic, 31 Ill. 2d at 590, 202 N.E.2d at 472, quoting Frey v.

Wubbena, 26 Ill. 2d 62, 66, 185 N.E.2d 850, 853 (1962).  In order

to go behind the terms of the joint account agreement, the one

claiming adversely thereto has the burden of establishing by

clear and convincing evidence that a gift was not intended.  This

burden does not shift to the party claiming under the agreement. 

Murgic, 31 Ill. 2d at 591, 202 N.E.2d at 472.  

          However, there is a presumption of fraud or undue

influence where there is a fiduciary relationship between the

parties and the fiduciary has benefitted by virtue of his fidu-

ciary status.  The burden of proof is on the fiduciary to rebut

the presumption by clear and convincing proof that he has exer-

cised good faith and has not betrayed the confidence reposed in

him.  Significant factors in meeting that burden include a

showing that the fiduciary made a frank disclosure of the infor-

mation he had, he paid adequate consideration, and the principal

had competent and independent advice.  Rizzo v. Rizzo, 3 Ill. 2d

291, 304-05, 120 N.E.2d 546, 553 (1954); see Franciscan Sisters

Health Care Corp. v. Dean, 95 Ill. 2d 452, 464, 448 N.E.2d 872,

877-78 (1983).  Where a fiduciary relationship is alleged simply

on the basis of evidence showing trust and confidence have been

reposed by one person in another, the existence of the relation-

ship must be proved by clear and convincing evidence; one who

holds a power of attorney, however, is a fiduciary as a matter of

law.  Pottinger v. Pottinger, 238 Ill. App. 3d 908, 917, 605

N.E.2d 1130, 1137-38 (1992).  

          The trial court here cited Anthony v. Anthony, 20 Ill.

2d 584, 587, 170 N.E.2d 603, 604 (1960), for the proposition that

a presumption of undue influence will not arise from the mere

fact of a fiduciary relationship but requires a showing of

"participation in procuring execution of the will."  The execu-

tion of a will provides more protections, however, than do inter

vivos transfers arranged by the fiduciary, including transfers

which utilize joint tenancy accounts.  The court was concerned in

Anthony that it might be impossible for an elderly parent to

leave his property to a child who took care of him if a pre-

sumption of undue influence arose from the mere fact of a confi-

dential or fiduciary relationship.  Nevertheless, there are cases

that do hold the fact that a fiduciary relationship exists is not

sufficient to rebut the presumption of donative intent inherent

in joint tenancy accounts, absent evidence the fiduciary rela-

tionship was abused.  See In re Estate of Foster, 104 Ill. App.

2d 447, 453-54, 244 N.E.2d 620, 623-24 (1969); In re Estate of

Copp, 132 Ill. App. 2d 974, 980, 271 N.E.2d 1, 5 (1971); In re

Estate of Wilkening, 109 Ill. App. 3d 934, 939-40, 441 N.E.2d

158, 162 (1982); cf. Lemp v. Hauptmann, 170 Ill. App. 3d 753,

758, 525 N.E.2d 203, 206 (1988) (fiduciary relationship defeats

presumption of gift from parent to child).  None of these cases

involved a written power of attorney other than Lemp, which did

not involve a joint account, but they did involve actions on

behalf of another similar to actions typically taken by an

attorney-in-fact.    

          This court has refused to follow Foster, Copp, and

Wilkening and has held that where there were conflicting presump-

tions arising from the creation of a joint tenancy and the

existence of a fiduciary relationship, the presumptions canceled

each other, and the trial court was required to decide the case

on the evidence before it of donative intent and undue influence. 

In re Estate of Harms, 236 Ill. App. 3d 630, 639-40, 603 N.E.2d

37, 44 (1992).  We recently limited Harms to apply only where the

joint tenancy accounts were created prior to the fiduciary

relationship and where deposits made during the fiduciary rela-

tionship followed a procedure established prior to the relation-

ship.  In re Estate of Rybolt, 258 Ill. App. 3d 886, 890, 631

N.E.2d 792, 795 (1994).  Certainly, where the attorney-in-fact

actively uses his position to create the joint tenancies the

presumptions do not cancel; instead, the controlling presumption

is the presumption of fraud, which requires strong evidence to

overcome.  Rybolt, 258 Ill. App. 3d at 890, 631 N.E.2d at 795.  

          There is no presumption of donative intent unless it is

shown that "the making of the deposit and the execution of the

contract is in conformity with the statute."  Murgic, 31 Ill. 2d

at 590, 202 N.E.2d at 472.  The "statute" is section 2(a) of "An

Act to revise the law in relation to joint rights and obliga-

tions."  Ill. Rev. Stat. 1989, ch. 76, par. 2(a).  Other statutes

apply to statutory survivorship accounts in savings and loan

institutions, and to safe deposit boxes.  See Harms, 236 Ill.

App. 3d at 637, 603 N.E.2d at 42-43.  The parties have not sug-

gested whether a statute applies to a joint mutual fund account

with an insurance company.  The life insurance policy and the

teacher's pension do not involve joint tenancy accounts at all,

and accordingly there is no presumption of donative intent with

those holdings.  

                                    IV

          It is undisputed that Rose gave Vera her power of

attorney and that Vera benefitted by virtue of that relationship. 

The question in this case accordingly is whether Vera has met her

burden of rebutting the presumption of fraud by clear and con-

vincing evidence.  The trial court stated that Vera had met her

burden, that the court "has had the opportunity to watch Vera

testify for hours and to weigh and evaluate her answers and

credibility."  The resolution of these cases, however, should not

turn upon how good a witness the alleged donee happens to be. 

The legislature enacted the Dead-Man's Act (now 735 ILCS 5/8-201

(West 1994)) because of its recognition the survivor to a trans-

action has a temptation to testify falsely.  Hoem v. Zia, 159

Ill. 2d 193, 201, 636 N.E.2d 479, 483 (1994).  The parties have

not indicated how Vera's testimony was affected by the Dead-Man's

Act.  Even where there is no Dead-Man's Act problem, the testimo-

ny of a donee as to what was said to him by a deceased donor

should be carefully scrutinized.  Hofferkamp v. Brehm, 273 Ill.

App. 3d 263, 274, 652 N.E.2d 1381, 1389 (1995).  One of the Rizzo

factors is whether the principal had competent and independent

advice.  Rizzo, 3 Ill. 2d at 304-05, 120 N.E.2d at 553.  Along

those lines, the court in Rybolt, although generally relying on

the presumption of fraud, found donative intent as to a $20,000

CD at the First National Bank of Decatur "based upon testimony of

the bank employees."  Rybolt, 258 Ill. App. 3d at 890, 631 N.E.2d

at 795.  

          Applying the Rizzo factors, Vera has clearly not met

her burden.  Vera filled out the signature cards for the various

accounts and was the only one present when Rose signed them,

although Vera later prepared a document regarding the Chestnut

accounts that Rose signed before a notary public.  Vera prepared

the forms regarding the TRS pension and the life insurance and

was the only one present when they were signed.  The joint mutual

fund with Prudential did not involve Rose's signature at all;

Vera opened it using her power of attorney.  Rose did not have an

established practice of using joint tenancy accounts before she

gave Vera her power of attorney.  During the last years of life

Rose went from having no assets in joint tenancy to having all

her personal property in joint tenancy with Vera.  Perhaps it was

Rose's plan to take care of those who took care of her, but that

does not explain why Vera was entitled to almost nothing immedi-

ately before Hester's death and almost everything very quickly

thereafter.  Hester and her family were apparently natural

objects of Rose's bounty even before Hester was given power of

attorney in 1979.  Was not Hester entitled to something for her

work between 1979 and 1988?  Most of Rose's physical needs were

met by the nursing home.  The only independent evidence regarding

Rose's competency was that she was easily led.  

          The trial court noted it might have been wiser if

disinterested third persons had been involved, but that ideal did

not comport with how such matters are actually handled in prac-

tice.  We reject that analysis.  Once the presumption of fraud is

established, the burden shifts to the fiduciary to show by clear

and convincing evidence that the transaction was fair and equita-

ble and did not result from undue influence.  Deason v. Gutzler,

251 Ill. App. 3d 630, 637, 622 N.E.2d 1276, 1281-82 (1993).  Vera

did not do so here.                                               

                                     V

          Petitioners argue sanctions should be imposed on Vera. 

The trial court did rule against Vera to the extent of the inter

vivos transfers.  However, the trial court never ruled on the

motion for sanctions.  The issue is not properly before us.  See

Almgren v. Rush-Presbyterian-St. Luke's Medical Center, 162 Ill.

2d 205, 210, 642 N.E.2d 1264, 1266 (1994).  That portion of the

appeal is dismissed.

          For the reasons above stated, we reverse the ruling

appealed from and remand for the entry of an order in accordance

with the views set out herein.  We dismiss that portion of the

appeal relating to sanctions against Vera.

          Reversed and remanded in part; dismissed in part.

          STEIGMANN, P.J., and McCULLOUGH, J., concur.